**GEORGIA–PACIFIC CORPORATION**

v.

**The UNITED STATES.**

No. 882–71.

United States Court of Claims.

Dec. 17, 1980.

330

Pierre J. LaForce, Washington, D. C., attorney of record, for plaintiff. Steven C. Lambert and Wilkinson, Cragun & Barker, Washington, D. C., of counsel.

Howard O. Sigmond, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant.

Before NICHOLS, KASHIWA and SMITH, Judges.

## OPINION

**PER CURIAM:**

This case is before the court on plaintiff's exceptions to the report of Trial Judge Thomas J. Lydon.

After consideration of the briefs and oral argument of the parties, we adopt the report, as modified, as an opinion of this court. Since we disagree with Part IV of the report, dealing with compensation for delay in payment, we have deleted that portion and submitted our own discussion in lieu thereof. The conclusion of law has been changed to reflect our view of the delay in payment issue.

The trial judge's report, as modified, follows:

### OPINION OF TRIAL JUDGE *

LYDON, Trial Judge: Some 3,368 acres of land owned by plaintiff in Humboldt County, California, were legislatively taken from it by Pub.L. No. 90–545, approved October 2, 1968, 82 Stat. 931, 16 U.S.C. § 79c(b)(1) (1976), relative to establishment of Redwood National Park. It is conceded that plaintiff is entitled to recover just compensation as a result of this taking.

However, the parties have been unable to agree completely on the amount of just compensation that should be paid.

A number of issues involved in this litigation have been resolved by the parties.[1] The issues remaining for decision herein are:

1) whether plaintiff suffered severance damages to its remainder property as a result of the taking, and, if so, the amount thereof;

2) the appropriate rate of interest to apply as part of just compensation for the delay in payment of such severance damages;[2] and

3) whether plaintiff is entitled to recover litigation expenses (including reasonable attorney, appraisal and engineering fees) incurred because of this proceeding under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Pub.L. No. 91–646, 91st Cong., 2d Sess., approved January 2, 1971, 84 Stat. 1894, 42 U.S.C. § 4651 (1976) (hereinafter Uniform Relocation Act).

## I

### A

Plaintiff, a Georgia corporation, has its principal offices in Portland, Oregon. It has additional offices and major business sites located throughout the United States. Plaintiff is in the business, among other things, of growing, processing, manufacturing and marketing timber and forest prod-

---

* The trial judge's recommended decision and conclusion of law are submitted in accordance with Rule 134(h) and, as modified by the court, is set forth.

1. Between April 9, 1969, and September 25, 1971, defendant paid, as part of the just compensation due plaintiff, $25,642,000, with simple interest thereon at the rate of 6 percent. The interest payments on the principal amount, *supra*, amounted to $2,200,022.09. Certain claims advanced in the petition (filed on December 30, 1971) by plaintiff were settled by the parties and a judgment, approving the settlement, was entered by the court on April 15, 1977, whereby plaintiff received an additional payment of $18,000,000, which amount included interest, 213 Ct.Cl. 770. As a result of this settlement, the fair market value of the land taken from plaintiff and claims for loss of personal property, as well as interest related thereto, are no longer issues in this case.

2. Subsequent to trial, the court, by order dated February 8, 1978, approved a stipulation and partial settlement, whereby the parties, *inter alia*, agreed that plaintiff suffered compensable severance damages in the amount of $184,500, which were attributable to the physical severance of certain of its roads as a result of the taking. The parties agreed that this amount should be included in the judgment rendered herein, with appropriate interest thereon for delay in payment thereof.

ucts. It is a major forest products manufacturing concern with extensive holdings of fee timberlands. This litigation is only concerned with certain of plaintiff's lands and holdings in Humboldt County, California, which, in plaintiff's corporate organizational structure, were managed by its Samoa Division in 1968.

As of October 2, 1968, plaintiff owned certain forest lands in Humboldt County known as the Big Lagoon tract. It appears plaintiff purchased this tract from the Hammond Lumber Company in 1956 or 1957. The tract consisted of roughly 88,000 acres of mostly commercial timberlands. This tract was managed and operated by the Samoa Division for the growth, harvest and manufacture of the timber located thereon. Old-growth redwood timber was the primary timber species on the Big Lagoon tract. However, there were also substantial volumes of old-growth Douglas fir, young-growth redwood and Douglas fir, as well as lesser volumes of other timber species. Plaintiff, and its predecessor owner, had harvested timber from this tract for several decades prior to October 2, 1968. On October 2, 1968, the tract consisted of a mixture of timber age classes and land conditions, ranging from uncut virgin timber areas to recent clear-cut and residual areas. As of March 1, 1968, it was roughly estimated that this tract contained, at a minimum, some 1.7 billion board feet of timber, of which some 1.6 billion board feet was estimated to be old-growth timber. On October 2, 1968, a system of truck roads had been constructed, and were being maintained, on the Big Lagoon tract for the logging of timber.

On October 2, 1968, plaintiff owned and operated, through its Samoa Division, a number of facilities to process and manufacture harvested timber in Humboldt County. These facilities included a redwood sawmill, a pulpmill, a studmill, a plywood plant, docks and loading facilities, shops, company housing, etc. These facilities were located on 449.58 acres of industrial land in Samoa, California. A sawmill was also located on the Big Lagoon tract. The Samoa facilities were about 10 miles southwest of the Big Lagoon tract. Plaintiff owned a railroad right-of-way which connected the Big Lagoon tract to the Samoa facilities, but as of October 2, 1968, it did not use this railroad for transportation purposes, utilizing instead truck transportation.[3] None of plaintiff's facilities described above were taken.

The 3,368 acres of land taken from plaintiff consisted of roughly a 12-mile elongated and irregular, in width, portion of the northeastern section of the Big Lagoon tract. This relatively narrow strip of taken land, a portion of which was sometimes referred to as "the worm" area, was on the west side of Redwood Creek, following its course thus explaining its irregular shape, and extended roughly from the area east of the town of Orick, California, southward for some 12 miles. Of the total acreage taken, only some 295.9 acres represented nonstocked and nontimbered lands. The remainder of the taken lands contained valuable commercial timber, including large volumes of high-quality, old-growth redwood timber. It was estimated that the taking removed over 18 percent of the total timber volume on the Big Lagoon tract. In substance, the taking removed 3,368 acres of land from the northeast corner of the 88,-

3. At time of trial, the property and assets of the Samoa Division, including the Big Lagoon tract and the facilities on the tract and at Samoa, were no longer owned by plaintiff. Pursuant to a 1972 consent order entered into with the Federal Trade Commission, plaintiff was required to divest itself of certain acquisitions. See 81 F.T.C. 984, 1011–12. In compliance with this order, a new and independent corporation was formed, called Louisiana-Pacific Corporation, to which plaintiff transferred the property and assets of the Samoa Division in early 1973. The record indicates this transfer was effected at book value and did not reflect the fair market value for the property and assets involved. Since plaintiff was the owner of the property in question on October 2, 1968, the date of taking, it is the party entitled to any compensation due as a result of said taking. United States v. Dow, 357 U.S. 17, 20, 78 S.Ct. 1039, 1043, 2 L.Ed.2d 1109 (1958); Lacey v. United States, 219 Ct.Cl. ——, ——, 595 F.2d 614, 619 (1979).

000-acre Big Lagoon tract. The tract itself was not bisected as a result of the taking.

## B

Since pertinent language in Pub.L.No. 90–545, *supra*, (hereinafter "the Park Act"), plays an important role in plaintiff's severance damages presentation, it is deemed necessary to set forth said language in full.

The Park Act in its preamble stated that Redwood National Park was established:

> * * * in order to preserve significant examples of the primeval coastal redwood (Sequoia sempervirens) forests and the streams and seashores with which they are associated for purposes of public inspiration, enjoyment, and scientific study * * *.

Section 2(a) of the Park Act severely restricted the authority of the Secretary of Interior as to the size of the park by providing that the "acreage within said park shall at no time exceed fifty-eight thousand acres, exclusive of submerged lands." But the Secretary was given authority to modify the park boundary lines:

> * * * from time to time, with a view to carrying out the purpose of this Act and with particular attention to minimizing siltation of the streams, damage to the timber, and assuring the preservation of the scenery within the boundaries of the national park as depicted on said maps * * *.

*See Miller v. United States*, 209 Ct.Cl. 135, 531 F.2d 510 (1976).

Section 3 of the Park Act provided in pertinent part:

> (a) The Secretary is authorized to acquire lands and interests in land within the boundaries of the Redwood National Park and, in addition thereto, not more than ten acres outside of those boundaries for an administrative site or sites. Such acquisition may be by donation, purchase with appropriated or donated funds, exchange, or otherwise, but lands and interests in land owned by the State of California may be acquired only by donation.
>
> \* \* \* \* \* \*

> (d) The Secretary is further authorized to acquire, as provided in subsection (a) of this section, lands and interests in land bordering both sides of the highway between the present southern boundary of Prairie Creek Redwoods State Park and a point on Redwood Creek near the town of Orick to a depth sufficient to maintain or to restore a screen of trees between the highway and the land behind the screen and the activities conducted thereon.

> (e) In order to afford as full protection as is reasonably possible to the timber, soil, and streams within the boundaries of the park, the Secretary is authorized, by any of the means set out in subsections (a) and (c) of this section, to acquire interests in land from, and to enter into contracts and cooperative agreements with, the owners of land on the periphery of the park and on watersheds tributary to streams within the park designed to assure that the consequences of forestry management, timbering, land use, and soil conservation practices conducted thereon, or of the lack of such practices, will not adversely affect the timber, soil, and streams within the park as aforesaid. As used in this subsection, the term "interests in land" does not include fee title unless the Secretary finds that the cost of a necessary less-than-fee interest would be disproportionately high as compared with the estimated cost of the fee. No acquisition other than by donation shall be effectuated and no contract or cooperative agreement shall be executed by the Secretary pursuant to the provisions of this subsection until sixty days after he has notified the President of the Senate and the Speaker of the House of Representatives of his intended action and of the costs and benefits to the United States involved therein.

## C

Both parties engaged the services of consultants with forest industry experience to serve as expert witnesses on the issue of severance damages. Plaintiff's severance

damage appraisal report was the product of the joint effort of consulting foresters Robert E. Kleiner (Kleiner) and Wesley Rickard (Rickard). Milton Mater (Mater), a consulting professional engineer, was utilized as an expert on one phase of Kleiner and Rickard's severance damage appraisal, presumably because they did not consider themselves experts in the valuation of forest products facilities, the phase of their severance damage presentation covered by Mater. Defendant's severance damage appraisal report was the product of the joint effort of consulting foresters Warren S. Halsey (Halsey) and Arnold F. Wallen (Wallen). Kleiner and Rickard and Halsey and Wallen were deemed qualified to offer expert opinions in the fields of forest management, forest appraisals and related forest practices and procedures. On balance, however, the experience and knowledge of Halsey and Wallen in the redwood region and with the redwood industry was much greater than that of Kleiner and Rickard. Mater was deemed qualified to express opinions in the area of forest products facilities such as sawmills and pulpmills. Halsey did not consider himself an expert in evaluating forest products facilities such as sawmills, etc. Accordingly, Wallen was responsible for dealing with such matters in defendant's appraisal report and in his testimony. Because of his wide experience in all phases of the forest products industry, including sawmill appraisals, Wallen was considered qualified to offer opinions as to valuation of forest products facilities.

Plaintiff also offered Raymond E. Granvall, Jr., a real estate appraiser, as a witness, not for purposes of expert appraisal testimony, but solely for the purpose of presenting one way of comparing logging costs that an appraiser could consider when two different logging methods were under scrutiny. Defendant made no objection to Granvall being offered as a witness for this limited purpose, i. e., comparative logging cost analysis. Halsey's experience was more extensive and his testimony was found more persuasive than was Granvall's experience and testimony on matters of comparative logging costs.

Plaintiff called two additional witnesses, under what it deems "protest," as experts, John E. Day (Day) and Ross Bowles (Bowles), after the trial judge denied plaintiff's motion during trial, which motion was opposed by defendant, that the court appoint Day and Bowles as the court's expert witnesses on the issue of severance damages under Rule 706 of the Federal Rules of Evidence. The fears expressed by plaintiff that it might be bound by the appraisal report and testimony of Day and Bowles are unfounded. In my analysis and conclusions, under the existing circumstances, neither party has been deemed bound by this report and attendant testimony. It is to be noted that pertinent procedures specified in Rule 706(a) relative to court appointment of an expert witness were not followed in the case, e. g., these witnesses had no contract with the court until they testified, and they received no instructions from the court as to their duties. Both parties rightly concede that court appointment of expert witnesses is within the discretion of the trial judge, *Fugitt v. Jones*, 549 F.2d 1001, 1006 (5th Cir. 1977). Divergence of opinions among the experts of the parties does not require that the court appoint experts to assist it in resolving such conflicts. *Daly City v. Smith*, 110 Cal.App.2d 524, 243 P.2d 46 (1952). *See also Oatley v. Callender McAuslan & Troup Co.*, 72 R.I. 334, 51 A.2d 88 (1947). Here, the trial judge was of the view that additional experts would not serve to elucidate, clarify, or enlighten him, but instead would add more divergence and opinion differences in a cumulative manner. The trial record proved him right in this regard. Although continuing to press the appraisal report and testimony of Day and Bowles, on the court, to the extent favorable to it, plaintiff, paradoxically, during trial and in its briefs advised that it would rely on the findings and conclusions of its own experts, and only these findings and conclusions would be presented to the court for adoption. Defendant opposed consideration by the court of the Day and Bowles appraisal report and testimony. Suffice it to say that the appraisal report and testi-

mony of Day and Bowles have been considered but have not been deemed helpful, under the circumstances of record, in resolving the issues at hand.

Additional witnesses were presented by both parties.

Plaintiff seeks to recover herein, as severance damages, the sum of $50,988,243. Defendant maintains that any award of severance damages in this case should not exceed $1,368,150. Plaintiff's severance damage claim is based on the reduction in value of certain portions of its Big Lagoon tract as well as other lands owned by it and the reduction in value of certain of its mill facilities because of the taking from it of 3,368 acres of the Big Lagoon tract. As a general observation with reference to the experts presented by the parties in this case, the expected tendency of the opinions and testimony of these experts to incline too much towards the litigation position of the side that engaged them was manifested in varying degrees. *See Seminole Indians of Florida v. United States,* 197 Ct.Cl. 350, 361, 455 F.2d 539, 545 (1972). On this record, however, defendant's experts presented a more balanced consideration of the thinking of a hypothetical buyer and seller than was the case with plaintiff's experts who were, in my opinion, more buyer oriented.

## II

There is agreement, and rightly so, by the parties that any evaluations herein must be determined as of October 2, 1968, the date of taking. *United States v. Miller,* 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943). The parties also approach the problem of severance damages from the viewpoint of a hypothetical willing buyer and willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts. *See Jack Daniel Distillery v. United States,* 180 Ct.Cl. 308, 315–16, 379 F.2d 569, 574 (1967).

Defendant's experts relied on the following definition of severance damages:

When the United States acquires only part of a single tract in one ownership, if the taking diminishes the value of the remainder, the owner is entitled to compensation for the losses as for a taking. Although "somewhat loosely spoken of as severance damages," it is an element of value arising out of the relation of the part taken to the entire tract.

This definition was based on language to be found in *United States v. Miller, supra,* 317 U.S. at 376, 63 S.Ct. at 281, and *Bauman v. Ross,* 167 U.S. 548, 574, 17 S.Ct. 966, 976, 42 L.Ed. 270 (1897).

While plaintiff's definition of severance damage basically embraces the one set forth above, albeit, with different phraseology, plaintiff's experts additionally believed that severance damage " * * * can generally be seen when: * * * The reduction in value to the remainder is a direct result of the partial taking *and/or the proposed use of the part taken.*" (Emphasis supplied.) Plaintiff's experts, in their appraisal analysis, took into account the use to which the United States put the land taken from plaintiff, *i. e.,* use as part of a park. Defendant's experts did not take into account, in their appraisal efforts, the use to which the taken land was put by the United States.

In the context of a fifth amendment taking, just compensation has been interpreted to mean "the full monetary equivalent of the property taken. The owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *Almota Farmers Elevator & Whse. Co. v. United States,* 409 U.S. 470, 473–74, 93 S.Ct. 791, 794, 35 L.Ed.2d 1 (1973). The "monetary equivalent" referred to above has found acceptance in the concept of fair market value, which value is normally to be ascertained, with reference to the property in question, from what a willing buyer would pay in cash to a willing seller, neither being under any compulsion to buy or sell and both being fully informed knowledgeable about all relevant matters. *See United States v. Miller, supra,* 317 U.S. at 374, 63 S.Ct. at 280; *United States v. Virginia Electric & Power Co.,* 365 U.S. 624, 633, 81

S.Ct. 784, 790, 5 L.Ed.2d 838 (1961). In circumstances where there is a partial taking of property, just compensation is mandated for any depreciation in value of the remaining property not taken which is occasioned by the partial taking. *See United States v. Grizzard*, 219 U.S. 180, 183–85, 31 S.Ct. 162, 163–64, 55 L.Ed. 165 (1911); *Sharp v. United States*, 191 U.S. 341, 351–52, 24 S.Ct. 114, 116, 48 L.Ed. 211 (1903). It is important to keep in mind that severance damage is not a separate and distinct item of just compensation. *See United States v. 91.90 Acres of Land*, 586 F.2d 79, 86 (8th Cir. 1978).

In *United States v. Fuller*, 409 U.S. 488, 490, 93 S.Ct. 801, 803, 35 L.Ed.2d 16 (1973), the Supreme Court observed that "[t]he constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness * * as * * * [it] does from technical concepts of property law." As a result, courts have had to adopt working rules in order to do substantial justice in just compensation cases. *United States v. Miller, supra*, 317 U.S. at 375, 63 S.Ct. at 280. The concept of just compensation, however, cannot be reduced to a formula, *United States v. Cors*, 337 U.S. 325, 332, 69 S.Ct. 1086, 1090, 93 L.Ed. 1392 (1949), nor can it be confined to inexorable rules, *United States v. Toronto, Hamilton & Buffalo Navigation Co.*, 338 U.S. 396, 402, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949). Under the circumstances of this case fair market value is an appropriate and practical approach to a just compensation award herein, keeping in mind the observations noted above.

Neither party used the standard "before and after" evaluation approach in their severance damage analysis.[4] This is generally the simplest and perhaps the most widely used approach in severance damage determinations. This approach also serves to lessen the pitfalls and problems that arise when a series of factors affecting value are added together to arrive at a total severance damage determination. *See United States v. 91.90 Acres of Land, supra*, 586 F.2d at 86–87.

In this case, the parties approached severance damages on a category-by-category basis, which plaintiff labeled a "modified before and after" approach, or on an item-by-item basis, wherein defendant attempted to determine where on the remainder land severance damage actually occurred or could have been reasonably anticipated as a result of the taking. Under plaintiff's "modified before and after" approach, plaintiff's experts identified the changes and economic factors affecting the property, which they deemed important to value, which factors and/or changes resulted, in their opinion, from the partial taking and the proposed use of the part taken. They identified these changes and factors and weighed their effect on the value of the property.

As indicated previously, the determination of just compensation is not confined to any rigid "formula," "inexorable rules," or method. Further, it is recognized that market value determinations must be reached, even though valuation methods employed by the parties make the path to

---

4. In this approach, severance damage is arrived at by first determining the value of the entire property before the taking and then subtracting therefrom the value determined to be applicable to the property remaining after the taking. The difference, taking into account the value of the land taken, represents the diminution of value in the remainder property if this total is less than the value of the entire property before the take. The experts for both parties believed a before-and-after approach would not be appropriate in this case because the property in question represented a unique and large integrated timber operation such that an enormous and costly undertaking on the part of the experts would be required with no assurance that the result achieved would reflect a fair and reasonable valuation figure. The above valuation method is not the only approach to severance damages. For example, severance damage, under the laws of some states, is sometimes deemed to be the difference between the value of the remainder property before the taking and its value after the taking. *See Puget Sound Power & L. Co. v. Public Utility Dist. No. 1*, 123 F.2d 286, 290–91 (9th Cir. 1941), *cert. denied*, 315 U.S. 814, 62 S.Ct. 798, 86 L.Ed. 1212· (1942). There are, undoubtedly, other methods which may be used for severance damage evaluation purposes.

such determinations more difficult. *See Cities Service Gas Co. v. United States*, 217 Ct.Cl. 590, 597, 580 F.2d 433, 437–38 (1978). The approaches to severance damages herein represent practical efforts by the parties to reach valuation determinations in a very unique and complex set of circumstances. While these approaches are accepted for purposes of reaching severance damage determinations herein, it should be borne in mind that the burden of proof rests on plaintiff to establish depreciation of the value of the remaining property because of the partial taking. *United States v. 329.05 Acres of Land*, 156 F.Supp. 67, 71 (S.D.N.Y. 1957), aff'd 263 F.2d 331 (2d Cir. 1959). The particular evaluation approach utilized by a party in severance damage situations can sometimes serve to increase the burden it must carry in persuading that speculation and conjecture are not the essence of its presentation. *See United States ex rel. T. V. A. v. Robertson*, 354 F.2d 877, 881 (5th Cir. 1966).

 As a general proposition, whether or not remainder property in a partial taking situation suffers resulting depreciation is a question of fact. Such a determination embraces all the facts and circumstances a reasonable, fully-informed and knowledgeable willing seller and willing buyer would consider at the time of a hypothetical transaction on the date of taking. *See United States v. 3969.59 Acres of Land*, 56 F.Supp. 831, 839 (D.Idaho 1944). Case law indicates that a wide range of factors are relevant in severance damage determinations and that, in general, they are essentially ad hoc factual inquiries.[5]

Depreciation of remainder land because of the use to which taken land is put is recognized as an evaluation factor that may be considered in a severance damage determination. *Sharp v. United States, supra*, 191 U.S. at 354, 24 S.Ct. at 117; *United States v. Grizzard, supra*, 219 U.S. at 183, 31 S.Ct. at 163; *West Virginia Pulp & Paper Co. v. United States*, 200 F.2d 100, 103–04 (4th Cir. 1952). Plaintiff's experts, as indicated previously, believed that use of the taken land as a park would serve to depreciate the value of the remainder land, whereas defendant's experts did not believe that such a use would have any such effect.[6]

5. Contrary to the assertions of plaintiff, I do not consider Halsey to have used post-taking data and information as direct and primary evidence of value. Instead, Halsey referred to post-taking logging practices for purposes of corroborating the reasonableness of the views of a 1968 prospective purchaser and seller as to their anticipations relative to future logging efforts in various remainder areas. Such evidence, referenced by Halsey, can be considered not as a standard of value in itself, but for its bearing on the anticipations of a purchaser and seller at the time of taking. *See United States v. Brooklyn Union Gas Co.*, 168 F.2d 391, 397–98 (2d Cir. 1948). There is no quibble with plaintiff's assertion that damages must be ascertained as of the date of taking. *King v. United States*, 205 Ct.Cl. 512, 518, 504 F.2d 1138, 1142 (1974). However, the concept of market value is not an end in itself, but is more generally a means to an end. In circumstances where the prediction of damages rests on uncertain future events, which is the case here, reasonable use of hindsight would not, in any event, be fatal as plaintiff so strenuously maintains. *See* 4 Nichols', The Law of Eminent Domain, § 12.231[1][2] (3d rev. ed. 1969). As to the use of hindsight, the United States Supreme Court observed: "This is a situation where the law should express 'a judgment from experience as against a judgment from specula-

tion.' *Tanner v. Little*, 240 U.S. 369, 386, 36 S.Ct. 379, 60 L.Ed. 691 [1916]. Or, as it was put by Mr. Justice Cardozo for the Court in a relevant situation: 'Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within.' * * * " *United States v. Westinghouse Co.*, 339 U.S. 261, 267, 70 S.Ct. 644, 647, 94 L.Ed. 816 (1950). *See also Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698, 53 S.Ct. 736, 739, 77 L.Ed. 1449 (1933).

6. It is to be noted that Redwood National Park involved the legislative taking of lands from a large number of parties. The Act authorized a park of 58,000 acres. Plaintiff's taken lands, which were made a part of the park, consisted of 3,368 acres. Some 27,468 acres of the park as established were formerly state redwood parklands. It is generally recognized that a severance damage determination cannot take into account the use to which the United States puts lands taken from others. *Campbell v. United States*, 266 U.S. 368, 371, 45 S.Ct. 115, 116, 69 L.Ed. 328 (1924). It would appear that since plaintiff's lands were in the critical Redwood Creek area, they were important in the constitution of the park. *See generally* H.R.

■ Plaintiff argues that Halsey's failure to consider the use to which the taken land was put is inconsistent with the legal definition of severance and constitutes error as a matter of law. This broad charge cannot be accepted. Indeed, Halsey's definition of severance damage comports most favorably with the legal definition of severance damage used by the court in *Coast Indian Community v. United States*, 213 Ct.Cl. 129, 146–47, 550 F.2d 639, 648 (1977). Interestingly, Kleiner, plaintiff's expert herein, was also the severance damage expert for the *Coast Indian Community* in the above-referred-to case. It seems obvious that the use to which taken land is put, in the context of severance damages, is merely an evaluation factor that may or may not be viable depending on the circumstances of each case. Reasonable experts can disagree on such a matter, depending on how they view a hypothetical buyer and seller. If an expert, in the eyes of a court, improperly fails to consider the factor of use, in a severance damage situation, less weight presumably would be given to his opinion. Plaintiff's position that use must be considered in any severance damage appraisal cannot be accepted. Use may be considered if an expert believes it to be a proper evaluation factor. This is the holding to be gleaned from the many "use" cases cited by plaintiff. These cases also suggest that use of partially-taken land is best considered as a broad general factor, together with other factors, in a before-and-after evaluation approach to severance. When use is considered separately and apart from an overall evaluation of the total property, the problems of speculation and conjecture become more pronounced. *See United States ex rel. T.V.A. v. Robertson, supra*, 354 F.2d at 881.

It is important to note that plaintiff's remainder land was timbered forest land similar to the adjacent park take land. It is unquestioned that the park take land was to remain pristine and undisturbed, providing a cathedral-like environment. From a physical viewpoint, the establishment of the park created no actual nor potential physical hazard to the remainder land. Nor could one reasonably anticipate fears of possible physical damage because of the park's presence. The taken land in this case was not to be used for military purposes which would damage and depreciate the remainder land (*Sharp v. United States, supra*); nor was the taken land herein permanently flooded such as to deprive the remainder land of access to a public road (*United States v. Grizzard, supra*); nor was the taken land to be used for the storage of gasoline for the Air Force with hazardous potential (*West Virginia Pulp & Paper Co. v. United States, supra*).[7] *See Boyd v. United States*, 222 F.2d 493, 494–95 (8th Cir. 1955), where claimed severance damages for diminution in value to remainder land merely because said land was made to adjoin an Air Force base by reason of a partial taking was denied.

1630, 90th Cong., 2d Sess. pp. 6, 19, 27 (1968). Whether plaintiff's particular lands were indispensable to the creation of the park is an open question. It seems reasonable to observe that less public concern might be generated, a factor which underscores plaintiff's severance damage theory, if the park only encompassed plaintiff's taken lands of 3,368 acres instead of the 58,000-acre park authorized by Congress. It is undisputed that the taken lands were used for park purposes and allegedly contributed to the damage about which plaintiff complains. While the matter is not free from doubt, it would not seem fair to apply the *Campbell* holding, *supra*, to resolve the appropriateness of considering the use made of the taken lands in this case. *See United States v. Pope & Talbot, Inc.*, 293 F.2d 822, 825 (9th Cir. 1961).

7. Plaintiff relies on other cases of like import, e. g., *United States v. Dickinson*, 331 U.S. 745, 750–51, 67 S.Ct. 1382, 1385–86, 91 L.Ed. 1789 (1947) where part of a tract of land was flooded causing resulting erosion to remainder of the tract; *United States ex rel. T.V.A. v. Easement and Right of Way*, 405 F.2d 305, 308–09 (6th Cir. 1968) (fear of danger from high voltage power lines on narrow easement strip through tract of land). The basic question, as is generally the case, is what conclusion would a reasonable buyer and seller draw from the use to which the taken land is put. *See United States v. Meadow Brook Club*, 259 F.2d 41, 45 (2d Cir.), *cert. denied*, 358 U.S. 921 (1958), *aff'g* 149 F.Supp. 749 (E.D.N.Y.1957).

█ The presence of a park is generally not considered to have a depreciating effect on the surrounding lands. *See Reichelderfer v. Quinn*, 287 U.S. 315, 318–19, 321, 53 S.Ct. 177, 178–79, 77 L.Ed. 331 (1932).[8] As to the establishment of parks generally *see Shoemaker v. United States*, 147 U.S. 282, 297–304, 13 S.Ct. 361, 389–92, 37 L.Ed. 170 (1893).

In this case, it is difficult to accept the view, without more, that the mere establishment of Redwood National Park served to depreciate in value the adjacent commercial timberlands of plaintiff. The use of the taken land as a park was not incompatible, on this record, with plaintiff's commercial timberland operation. Redwood state parks existed in California before October 2, 1968, and there is no persuasive evidence in the record that timberland sales of lands adjoining said parks reflected depreciation in value of said lands merely because said lands bordered on the parks.[9]

### III

The determinative question in this case is what a reasonable and knowledgeable buyer and seller would pay on or about October 2, 1968, for plaintiff's remainder property as a result of the partial taking. It is now time to answer that question in the context of plaintiff's specific severance damage claims.

**8.** In 4A Nichols', The Law of Eminent Domain, § 14.232 (1976) it was observed:

"The damage to the remaining land frequently turns upon the use for which the land is taken. Such damage might be very serious if part of a large tract available for residential purposes was taken for a railroad, *and nothing at all if the same portion was taken for a park.*" (Emphasis supplied.)

**9.** One of plaintiff's witnesses did testify that he was able to purchase some timberland next to a state park at a reduced price because the owner was unwilling to spend the extra money necessary to harvest the timber along the boundary line in a manner so as to prevent the trees from falling onto or otherwise damaging state parkland. The witness advised that the extra cost he estimated he would have to spend to log the timber along the boundary line so as not to impinge on state parkland was reflected

Plaintiff advances five categories of claims for severance damage consideration, seeking recovery of the amounts in parenthesis: 1) reduction in timber volume harvest on remainder lands because of anticipated changes in logging methods ($25,834,-600); 2) increases in logging and supervision costs because of anticipated changes in logging methods and the anticipated necessity to protect the park ($17,563,348); 3) anticipated changes in management practices because of the park's presence ($4,000,-000); 4) anticipated depreciation in value of certain manufacturing facilities because of reduced timber supply ($1,902,331); and 5) anticipated increased costs for replacing gravel supply, anticipated increased animal damage to remainder lands, and increased management costs because of anticipated conflicts resulting from the presence of the park ($1,751,312). As indicated previously, the total amount claimed as severance damages is $50,988,243.

*Categories 1 and 2 Severance Damages*

█ Plaintiff contends that as a result of the partial taking and the attendant creation of the park, a reasonable and knowledgeable buyer and seller of the remainder property would depreciate the market value of said property because they would anticipate that they would be unable to log timber on certain areas of this property in the same manner as before the taking.[10] This anticipation, according to

in the lower price he paid for the land. Parenthetically, this is precisely the type of severance damage that Halsey recognized in his appraisal analysis. However, absent special agreements, this same result undoubtedly would have occurred if the taken land was used as a monastery instead of a park. A boundary line is generally not to be ignored regardless of the use to which the neighbor puts his property.

**10.** Prior to the taking date, plaintiff anticipated that the remainder lands here in question would generally have been tractor logged in a clear-cut fashion. Clear-cut logging involves the cutting and removal of virtually all trees within a designated harvest area. After the taking, plaintiff anticipated that these remainder lands would have to be either cable logged in a selective fashion or cable logged in a clear-cut fashion. Selective logging refers to a prac-

plaintiff, would rest on the awareness of a buyer and seller of the background of public controversy relating to redwood logging in California prior to creation of the park, the legislative history of the Park Act and the specific language of the Park Act itself.

Plaintiff does not claim that all areas of its remainder property suffered a reduction in value because of the taking. Instead, it claims that there were five "Sensitive Areas" (sometimes hereinafter "SA") in which it would have to utilize different logging methods and thus would anticipate greater logging expenses and less timber volume production which would, in turn, serve to depreciate the values of these sensitive areas. These five sensitive areas covered 8,551.28 acres and comprised less than 10 percent of the remainder property acreage.

Sensitive areas 1, 2, and 3 are such that they can be considered together. The beginning postulate for plaintiff is that each of these areas would have been tractor logged in a clear-cut manner absent the taking in issue.

Sensitive area 1 was located west of the park and east of the town of Orick and the Pacific Ocean. SA 1 began near the top of a ridge and adjoined the park on the east at the top of the ridge. It was in the northwest corner of the Big Lagoon tract. SA 1 sloped downward and westerly, away from the park. This area consisted of 592.6 acres containing an estimated 76,953,000 board feet (BF) of net redwood, Douglas fir and other timber species. This area was generally suitable for tractor logging. The record clearly indicates that this area could be tractor logged in a clear-cut fashion subsequent to the taking without causing any physical damage to, or encroaching in any way, on the park. Plaintiff seeks to recover in sensitive area 1 category 1 severance damage of $1,545,236.50, based on the value of anticipated lost timber volume because this area would have to be cable logged in a selective fashion,[11] and category 2 severance damage of $1,420,528, based on anticipated extra costs which would be associated with cable logging this area selectively.

Sensitive area 2 was located on the west side of the Big Lagoon tract and lies east of a body of water known as the Big Lagoon. SA 2 was traversed by and exposed to full view from Highway 101, a main west coast north-south public highway. SA 2 was 6 to 8 miles from the nearest park boundary line and could not be seen from the park because of an intervening tall ridge. SA 2 covered 333.40 acres containing an estimated 61,049,000 BF of net redwood, Douglas fir and other timber species. This area was most suitable for tractor logging. There is no question but that this area could be tractor logged in a clear-cut fashion subsequent to the taking without causing any physical damage to, or encroaching in any way, on the park. Plaintiff seeks to recover in sensitive area 2 category 1 severance damage of $1,201,730.50, based on the value of anticipated lost timber volume because it felt this area would have to be cable logged in a selective fashion, and category 2 severance damage of $1,126,927, based on anticipated extra costs which would be associated with cable logging this area selectively.

Sensitive area 3 was located southwest of SA 2 and was some 8 to 10 miles from the nearest park boundary line. This area could not be seen from the park. Most of SA 3 is east of Highway 101, which bisects the area in the northern portion. Generally, SA 3 is exposed to full view from High-

tice in which something less, which could vary from 10 to 90 percent, than all the trees within a designated harvest area are cut and removed. It is established that generally cable logging is more costly than tractor logging and that selective logging is generally more expensive than clear-cut logging. The parties dispute the cost spread between these various logging methods. It is further established that cable logging and/or selective logging generally result in the additional loss of timber volume. Again, the parties disagree as to the volume loss differential between these various logging methods.

11. Selective cable logging was rarely, if ever, done in the redwood region either prior to or subsequent to the date of taking. The record persuades that no reasonable and knowledgeable buyer and seller of plaintiff's remainder lands in 1968 or thereafter would contemplate using this logging method to harvest timber from any part of the remainder land.

way 101. SA 3 covered 443.44 acres and contained an estimated 53,679,000 BF of net redwood, Douglas fir and other timber species. This area was most suitable for tractor logging. There is no question but that this area could be tractor logged in a clear-cut manner subsequent to the taking without causing any physical damage to, or encroaching in any way, on the park. Plaintiff seeks to recover in sensitive area 3 category 1 severance damage of $1,113,761.50, based on the value of anticipated lost timber volume because it felt this area would have to be cable logged in a selective manner, and category 2 severance damage of $990,891, based on anticipated extra costs which would be associated with cable logging this area selectively.

Kleiner's rationale for severance damages as to sensitive areas 1, 2, and 3 did not involve considerations of possible damages to the park relative to the choice of logging methods. As indicated earlier these three areas could be tractor logged in a clear-cut manner without damaging the park in any way.[12] Kleiner advised he included these areas in his severance damage determinations because these areas were visible to the traveling public from Highway 101 and/or the town of Orick. If these areas, in Kleiner's opinion, were tractor logged clear-cut, subsequent to October 2, 1968, such a logging operation would scar these areas and generate such adverse public opinion as to cause possible retaliatory action by the Secretary of Interior (Secretary) and/or Congress in the form of restrictive measures on the remainder lands [13] or possible additional taking of remainder lands.[14] It is appropri-

12. The concerns of Congress about protecting the park, voiced in the legislative history and expressed in the language of the Park Act, which plaintiff believes a hypothetical buyer and seller would contemplate, are in no way involved in these sensitive areas. It would accordingly be unreasonable for a buyer and seller to conclude from these materials that they would be unable to log sensitive areas 1, 2, and 3 in the usual, customary way, i. e., tractor log in a clear-cut manner. Halsey and Wallen, familiar with the redwood region and its temperament, saw nothing in the language of the Park Act or its legislative history which would cause an owner of sensitive areas 1, 2, and 3 to change its logging methods subsequent to October 2, 1968.

13. Generally, the imposition of restrictive measures on how one should log its land could in some instances constitute a compensable event. See Curtin v. Benson, 222 U.S. 78, 86–87, 32 S.Ct. 31, 32–33, 56 L.Ed. 102 (1911); United States v. Coughlin, 405 F.Supp. 13, 15 (D.Ore.1975). Compare Goldblatt v. Town of Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962). Kleiner conceded that the Secretary of Interior (Secretary) could not prohibit an owner of sensitive areas 1, 2, and 3 from tractor logging these areas in a clear-cut manner. His view was that by way of retaliation the Secretary under section 2(a) of the Park Act might enlarge the park boundary so as to embrace SA 1 or that Congress might impose on sensitive areas 2 and 3 screening easements that were imposed by section 3(d) of the Park Act on highway areas near the town of Orick. As to these views, it seems to me that future takings or restrictions on plaintiff's lands would give rise to a wholly independent cause of action. Accordingly, this case does not, and should not, cover such subsequent possibilities. See Boyd v. United States, 222 F.2d 493, 496 (8th Cir. 1955). Further, Kleiner felt that section 3(e) of the Park Act would also inhibit an owner of these sensitive areas from logging the land in the usual, more productive and less expensive manner. But, these sensitive areas could be logged tractor clear-cut without causing physical damage to the park. The thrust of section 3(e) was concern over future physical damage to the park. On analysis, none of these possibilities have been fairly shown to have been reasonably probable as of October 2, 1968. See Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934). There were no federal laws on October 2, 1968, which regulated logging practices on private lands in California. State laws, however, did regulate logging practices in California in 1968. Even if the Secretary were to lobby in an effort to influence the State of California to impose severe restrictive logging methods on redwood landowners subsequent to October 2, 1968, this would not serve to warrant the award of just compensation to plaintiffs. See De-Tom Enterprises, Inc. v. United States, 213 Ct.Cl. 362, 364–65, 552 F.2d 337, 339 (1977).

14. It has been observed that, "[a] mere declaration of an intention to take, or even a threat to take cannot constitute a compensable event." See 2 Nichols', The Law of Eminent Domain, § 6.1[1], 6–16 (3d ed. 1976); Hempstead Warehouse Corp. v. United States, 120 Ct.Cl. 291, 306, 98 F.Supp. 572, 573 (1951). See also Hilkovsky v. United States, 205 Ct.Cl. 460, 504 F.2d 1112 (1974).

ate to note here that the probability of change being brought about by future eminent domain action is of doubtful viability in an evaluation process. *See McGovern v. City of New York*, 229 U.S. 363, 372, 33 S.Ct. 876, 57 L.Ed. 1228 (1913). *See also United States ex rel. T.V.A. v. Powelson*, 319 U.S. 266, 285, 63 S.Ct. 1047, 1057, 87 L.Ed. 1390 (1943).

In order to prevent a crescendo of adverse public opinion which might induce Secretarial and/or Congressional retaliatory action against the remainder land property, Kleiner believed a buyer and seller would conclude these sensitive areas would have to be cable logged selectively, a logging method that would serve to reduce the value of these areas as of October 2, 1968, because such a method would be less productive and more expensive.[15]

These fears, *i. e.*, possible future restrictions and/or additional takings, on the part of a hypothetical buyer and seller, advanced by Kleiner, even if within the realm of possibility, have not been shown, on this record, to be reasonably probable as of October 2, 1968. As a result, plaintiff's sever-

ance damage claims for sensitive areas 1, 2, and 3 must be regarded as too remote and speculative to have any legitimate effect on the valuation of these areas. *Olson v. United States*, 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934). *See also United States v. 158.24 Acres of Land*, 515 F.2d 230, 232 (5th Cir. 1975); *Miller v. United States*, 137 F.2d 592, 595 (3d Cir. 1943); *Coast Counties Gas & Electric Co. v. Miller & Lux, Inc.*, 118 Cal.App. 140, 144, 5 P.2d 34, 35 (1931); *In re City of Meriden*, 88 Conn. 427, 91 A. 439, 440–41 (1914).

There is no probative evidence in the record that there was a sufficient likelihood that retaliatory action by the government would ensue if these sensitive areas were tractor logged clear-cut. *See Iriarte v. United States*, 157 F.2d 105, 111 (1st Cir. 1946). Indeed, on this record, it appears that the areas designated as sensitive areas 1, 2, and 3 by plaintiff were not viewed as critical or important areas as far as the park was concerned by the Secretary or other informed and knowledgeable people on or after the date of taking.[16]

---

**15.** As of October 2, 1968, the customary logging method in Humboldt County was tractor logging in a clear-cut manner. However, cable logging at this time was also an accepted logging method in the county. Indeed, plaintiff owned cable logging equipment at this time. Plaintiff, as of 1968, was generally tractor logging clear-cut its timberlands. It would be unreasonable to assume that a buyer and seller would anticipate changing to a more expensive and less productive method solely on the speculation that possible adverse public opinion might lead to future restrictions on the remainder lands. In the decades before 1968, public opinion and redwood timber operations were often at odds. Indeed, before the park was created, adverse public opinion generated by various conservation groups was directed at the tractor logging clear-cut methods utilized by redwood timberland owners. The park did not create this attitude. Prior to October 2, 1968, owners of redwood timberlands in areas visible to the public and/or adjacent to state redwood parks did clear-cut their timberlands by tractor in the face of strong public criticism and opposition. This same situation prevailed subsequent to 1968. The totality of the record supports the view that a buyer and seller on October 2, 1968, of sensitive areas 1, 2, and 3 would anticipate being able to tractor log in a clear-cut manner these areas if the landowner

desired to do so, and thus would not devalue these areas in negotiating a sale thereof.

**16.** Kleiner acknowledged that a reasonable purchaser of the remainder land would undoubtedly contact government officials to see what restrictions, if any, the government might impose or desire on the remainder land before negotiating a sale thereof. The record indicates that in January 1969, plaintiff advised park officials that it would oppose any restrictions on its harvesting operations. These officials responded by advising plaintiff they had no wish to do anything which would interfere with plaintiff's timber operations. Subsequent to creation of Redwood National Park, the Secretary engaged Edward C. Stone, professor of forestry at the University of California, to analyze ways to protect and preserve the park. He filed his report (Stone Report) with the Secretary on April 19, 1969. That report, fairly read, would clearly support tractor logging in a clear-cut fashion of sensitive areas 1, 2, and 3. This report would be one that a reasonable buyer and seller of the remainder lands might solicit relative to logging areas in the vicinity of the park, from an independent forestry expert such as Professor Stone on or about October 2, 1968.

While there is expected conflict between the experts of the parties on the matter, the record preponderates in favor of a finding that a reasonable and knowledgeable buyer and seller of plaintiff's remainder property would not reduce the value they would otherwise attach to said property because of sensitive areas 1, 2, and 3. Indeed, the record supports a finding that such a buyer and seller would conclude, as of the date of taking, that these sensitive areas could be logged tractor clear-cut if the landowner desired to do so.

Sensitive area 4, as conceived by Kleiner, embraced an elongated portion of the Big Lagoon tract remainder land along the west boundary of the park, generally paralleling the course of Redwood Creek. This elongated area had a width from the park boundary line into the remainder lands ranging from a few hundred feet to approximately 1 mile depending on the nature of the terrain and the tree cover. In length, the area ran from above McArthur Creek on the north, below sensitive area 1, and extended along the park's west boundary line to the southern end of the park. Sensitive area 4, as designated by Kleiner, consisted of 1,844.81 acres containing an estimated 266,469,000 BF of net timber. Roughly one-third of the southern half of SA 4 and most of the northern half of SA 4 were heavily forested with old-growth redwood, Douglas fir and other timber species. There were some areas on the southern half of SA 4 that had been logged years before 1968, while there were other areas that had been logged by plaintiff just prior to October 2, 1968. Some logging had also been done in the northern half of SA 4 prior to the date of taking. While some portions of SA 4 were suitable for tractor logging prior to October 2, 1968, the record suggests that other areas, either because of steep terrain and/or unstable soils, would probably be more suitable for cable logging prior to October 2, 1968.

Plaintiff seeks to recover in sensitive area 4 category 1 severance damage of $5,629,733, based on the value of anticipated lost timber volume because this area would have to be cable logged in a selective fashion, and category 2 severance damage of $4,918,915, based on anticipated extra costs which would be associated with cable logging this area selectively as well as extra costs for additional logging supervision to insure that harvest operations in the area did not damage the park.

Plaintiff maintains that all of SA 4 would have been tractor logged in a clear-cut manner absent the taking. I am persuaded by the record that some portions of SA 4 would probably have been cable logged prior to October 2, 1968, because of unstable soils. Plaintiff contends that a buyer and seller would anticipate, as a result of the taking, having to cable log SA 4 in a selective fashion. As indicated previously (see note 11, supra), selective cable logging would be an unreasonable anticipation on the part of a buyer and seller as of October 2, 1968.[17]

Kleiner's rationale for sensitive area 4 severance damages was as follows. The proximity of SA 4 to the park, a boundary line separated plaintiff's SA 4 remainder lands from the park, meant that users of the park, concerned about protecting the park, would be very watchful and critical of any logging operations or forest management activities in this area. Accordingly, the owner of SA 4 after the partial taking would feel he would have to log SA 4 in such a manner as to minimize the possibility of causing public concern such as would move the Secretary in the future to consider enlarging the park so as to incorporate

17. Kleiner conceded that the logging practices utilized in harvesting timber on SA 4 subsequent to October 2, 1968, did not completely conform to those logging practices anticipated by his prospective purchaser and seller. Subsequent to October 2, 1968, both cable logging in a clear-cut manner and tractor logging in a clear-cut manner were utilized in harvesting timber in SA 4. Both these methods were anticipated by the Stone Report as viable logging methods in SA 4 subsequent to 1968. None of SA 4 was cable logged in a selective manner. SA 4, subsequent to October 2, 1968, was logged right up to the park boundary line at various locations.

remainder land property into the park, under the provisions of section 2(a) of the Park Act, or to consider imposing restrictive measures on harvest operations on the remainder land under the provisions of section 3(e) of said Act.[18] In Kleiner's view a purchaser and seller, on reading these two provisions, would conclude they had better plan on harvesting SA 4 by cable logging said area in a selective manner and thus would accordingly reduce the value they otherwise would have attached to SA 4 had there been no partial taking.

As was the case with sensitive areas 1, 2, and 3, Kleiner's theory for sensitive area 4 severance damage rests on the anticipated fears of a buyer and seller that if SA 4 were tractor logged clear-cut, retaliatory action directed at the remainder lands by the Secretary might ensue. On this record, I am of the opinion that these anticipated fears of future restrictive Secretarial actions or takings relative to plaintiff's remainder lands if SA 4 were not cable logged selectively are too remote and speculative to have any viable effect on the valuation of SA 4 as of October 2, 1968. *See Olson v. United States, supra.* Plaintiff's fear of public concern generated by public use of the park as a whole provides a most tenuous basis for its SA 4 depreciation in value claim. *See United States v. Pope & Talbot, Inc.,* 293 F.2d 822, 826 (9th Cir. 1961).[19]

The proximity of SA 4 to the park and the fact that the boundary line created by the taking was in a forest with no dominant landmarks such as a creek or a road would undoubtedly cause a reasonable purchaser and seller to recognize that some adjustments in logging methods in SA 4 would be necessary as a result of the partial taking and thus would reasonably anticipate that some additional costs would be incurred in logging SA 4 after the taking. Accordingly, there is a valid basis to consider the viability of severance damages within SA 4 quite apart from plaintiff's theory of SA 4 severance damages. Halsey's element 1 severance damage allowance dealt with anticipated logging efforts after the partial

---

**18.** The authority and responsibilities of the Secretary and/or the Congress under the Park Act have been the subject of judicial scrutiny. *See Sierra Club v. Department of Interior,* 376 F.Supp. 90 (N.D.Cal.1974); 398 F.Supp. 284 (N.D.Cal.1975); 424 F.Supp. 172 (N.D.Cal. 1976). Both parties find comfort for their positions in various aspects of these decisions. Plaintiff points to the court's discussion of the responsibilities of the Secretary to protect the park, under the Act's provisions, and defendant notes the court's comment on adjoining landowners continuing to log in a manner, presumably tractor logging clear-cut, which was considered threatening to the park, undaunted by these ostensible powers of the Secretary under the Act. The denouement of these three decisions was the conclusion that protection of the park, under the Act, rested with the Congress and not the Secretary. Apropos possible future congressional action, it was noted in *Danforth v. United States,* 308 U.S. 271, 286, 60 S.Ct. 231, 237, 84 L.Ed. 240 (1939), that the mere enactment of legislation which authorizes future condemnation, but does not compel it, cannot provide the premise for a just compensation award since such legislation may be repealed, modified or fail for lack of appropriations. *See also Halpert v. Udall,* 231 F.Supp. 574, 577–78 (S.D.Fla.1964), *aff'd* 379 U.S. 645, 85 S.Ct. 610, 13 L.Ed.2d 550 (1965). A reasonable reading of section 3(e) suggests that the Secretary, absent legal action, could not impose restrictive logging measures on SA 4 without the consent of the landowner. Indeed, Kleiner agreed that the Secretary could not preclude a landowner as of October 2, 1968, from tractor logging SA 4. *See generally* Sax, *Helpless Giants: The National Parks and The Regulation of Private Lands,* 75 Mich.L.Rev. 239 (1976). As to legal action on the part of the Secretary to impose restrictions on the logging methods to be utilized, *see* note 13, *supra.*

**19.** The Stone Report (*see* note 16, *supra*) saw no major management problems with plaintiff in SA 4 if the logging practices in 1968–1969 then followed by plaintiff were continued. The problem in SA 4, according to the Stone Report, was with the soils. As to the logging practices that a landowner might anticipate in SA 4 on or about October 2, 1968, the Stone Report suggests that the logging methods utilized in this area would depend on topography and soil conditions as much as anything else. The Report indicates that cable logging in clear-cut patches would be required in some areas while clear-cut tractor logging would be utilized in other areas. What the Stone Report forecasted in 1969, and what a reasonable buyer and seller might have likewise forecasted at that time, came to pass in large measure when SA 4 was harvested in the 1970's.

taking in portions of Kleiner's sensitive area 4.

Halsey believed that a buyer of plaintiff's remainder land subsequent to October 2, 1968, aware of the Park Act, would be concerned about the investment he was about to make. However, the seller of said remainder land would not diminish the value he set on said timberlands merely because it was next to the park. In Halsey's view the prime concern of both a buyer and seller of the remainder land after the partial taking would be the ability to log the timber on said land. If the timber could be logged then the parties would undoubtedly negotiate a sale price without any value diminution. To the extent that the partial taking would make logging more expensive and difficult, then Halsey agreed there would be a resulting diminution in value recognized by the buyer and seller to reflect this fact. Halsey's views were more attuned, in my judgment, to those of both a reasonable and knowledgeable buyer and seller interested in negotiating a sale of the remainder property on or about October 2, 1968, than were the views of Kleiner and Rickard.

Halsey recognized that logging problems were created along the remainder land boundary line by the irregular boundary line established by the Park Act.[20] Subsequent to October 2, 1968, Halsey believed that a prospective purchaser and seller would recognize that different logging methods and practices would have to prevail after the partial taking in order to prevent trees from falling into the park. They would also recognize, according to Halsey, that the boundary line changed, in places, the topography available for logging such as to require that areas that would have been tractor logged before the taking would have to be cable logged after the taking to prevent intrusions onto parkland. These changes in logging methods and procedures would generate additional costs and expenses which a buyer and seller of SA 4, according to Halsey, would translate into a depreciation in value of said remainder land. This approach to severance damages does not embrace fears of remote or contingent possibilities of damage but "identifies severance damages as an element of value arising out of the relation of the part taken to the entire tract," *United States v. Miller, supra,* 317 U.S. at 376, 63 S.Ct. at 281, and attempts to meet the obligation created when the "part not taken is left in such shape or condition as to be in itself of less value." *Bauman v. Ross, supra,* 167 U.S. at 574, 17 S.Ct. at 976. Such an approach also provides a more "direct and identifiable element of depreciation in value consideration." *See Boyd v. United States, supra,* 222 F.2d at 495.

Halsey restricted his severance damage consideration to an 800-foot distance on the remainder land from the park boundary, along the 12 miles of park boundary line. Halsey selected this 800-foot distance because it corresponded to an average cable yarding (haul) distance. Cable logging was viewed by Halsey as the operation that would be envisioned if tractor logging was not feasible in this area. Halsey believed that a prospective purchaser and seller would recognize, on or about October 2,

**20.** The irregular western boundary line created by the Park Act was the result of a political compromise. *Sierra Club v. Department of Interior, supra,* 424 F.Supp. at 174. Prior to the partial taking, Redwood Creek, a natural boundary, separated plaintiff from its neighbor Arcata Redwood Co. Logging of plaintiff's lands under such conditions presented no problems about falling trees damaging neighboring property and allowed for complete flexibility in conducting logging operations. The partial taking, establishing an artificial boundary, did create some logging problems along the remainder lands bordering the park restricting in certain respects the flexibility in conducting logging operations that was available before the taking. Plaintiff refers to this irregular boundary line in the context of a buyer and seller of SA 4 worried about a neighboring public park concerned with preservation rather than at ease with a neighboring timber company concerned with commercial logging. However, as of October 2, 1968, commercial timberland owners had operated next to state parks in California for decades without undue concern. Plaintiff seems to concede this fact, but argues that the language in the Park Act directed at protecting the park gave rise to a completely different situation than prevailed previously.

1968, that timber immediately adjacent to the park would be more difficult to log because of the park boundary line, and that they would consider the 800-foot strip as the maximum distance that would be affected by said conditions which were brought about by the partial taking.

Halsey and Wallen utilized 1974 aerial photographs of the boundary line area, which were examined with special equipment, to obtain initial topographical and other information about the area.[21] Plaintiff is critical of Halsey because he did not visit the property prior to writing the appraisal report. The record, however, reveals that Halsey was familiar with the property in question having cruised plaintiff's lands previously. More importantly, Wallen, who was his joint partner in the appraisal effort, did visit the property prior to putting the report together. Further, Wallen had considerable personal experience with the Redwood Creek area. After the appraisal report was prepared, Halsey also made a ground inspection of the area in question.

Those areas in the 800-foot strip along the boundary line, on the remainder property, where the topography was flat and/or gentle and conducive to tractor logging without any possibility of causing intrusions into the park, Halsey believed a prospective buyer and seller in 1968 would anticipate tractor logging. On the other hand, those areas in the 800-foot strip where the topography was steep, and thus less conducive to tractor logging or where the park boundary line forced uphill logging, and the possibility of intrusions into the park existed, Hal-

sey believed a prospective buyer and seller in 1968 would anticipate cable logging in a clear-cut manner.[22] Halsey, utilizing a timber classification map of the pertinent area, superimposed on said map the results of the investigation of the 800-foot strip area along the park boundary line indicating thereon those areas which a prospective buyer and seller would anticipate would be cable logged and those areas which they would anticipate would be tractor logged.

Halsey's area of severance damage consideration embraced 1,066 acres containing an estimated 132,450,000 BF of net timber. Since over 90 percent of the timber in this area was redwood, Halsey treated all timber in this area as old-growth redwood. This practical approach is not considered unfair under the difficult circumstances of this case where estimates generally are the prevailing volume yardstick. As to the 1,066 acres, Halsey believed 521 acres containing an estimated 53,040,000 BF of net timber would be tractor logged, and 545 acres containing an estimated 89,410,000 BF of net timber would be cable logged. In view of the redwood experience of Halsey and Wallen, particularly with plaintiff's remainder lands, these volume estimates are considered to be reasonable and acceptable.

It is conceded that in cable logging operations involving old-growth redwood a greater amount of breakage occurs than would be the case if tractor logging were utilized. The parties disagree, and the record is conflicting on the matter, as to the extent of the excess breakage that occurs in such circumstances. Such excess breakage does

21. Plaintiff is most critical of Halsey's use of or reference to aerial photographs taken of the remainder area subsequent to 1968, because they postdated the taking and thus constituted improper hindsight evidence. However, the topography of the area was undoubtedly the same in 1974 and thereafter as it was in 1968, except to the extent changed by road construction. To this extent the criticism is unfounded. These aerial photographs also reflected the actual logging that had taken place on the remainder land since October 2, 1968, and it is this aspect of the photographs that ostensibly troubles plaintiff. In his testimony Halsey observed that it was difficult to assume that a

buyer and seller on October 2, 1968, would anticipate cable logging areas identified by plaintiff when actual logging experience, as revealed by the photographs, showed that these areas were tractor logged in large part. This observation by Halsey in context, indicates that these photographs reflecting logging methods utilized subsequent to 1968 (actual experience) did not corroborate the anticipations of plaintiff's hypothetical buyer and seller (speculation). See note 5, supra.

22. Halsey did not believe any reasonable buyer and seller would anticipate cable logging in a selective manner (see note 11, supra).

represent a loss of merchantable timber volume. Further, such a loss in volume is directly related to circumstances created by the partial taking and is a factor a reasonable prospective buyer and seller of the remainder land would consider in negotiating a sale of said land on or about the date of taking. *See United States v. 3969.59 Acres of Land*, 56 F.Supp. 831, 838 (D.Idaho 1944). *See also Hurley v. American Enka Corp.*, 93 F.Supp. 98, 103 (E.D.Tenn.1950).

For reasons discussed in full in the findings of fact, I am persuaded that, on balance, Halsey's estimate that 10 percent excess breakage occurs when old-growth redwood timber is cable logged in a clear-cut manner rather than tractor logged is both reasonable and acceptable. Halsey computed an anticipated net timber loss of 8,941,-000 BF (10 percent of 89,410,000 BF of net timber in the cable log areas) because of the necessity to cable log rather than tractor log the pertinent 545 acres. In the absence of any clarifying evidence in the record, it has been assumed that none of this acreage would have been cable logged in any event prior to October 2, 1968.[23] The parties stipulated that the value of old-growth redwood timber as of October 2, 1968, was $86 per thousand board feet (MBF) Humboldt short-log scale. Utilizing this figure, the value of the timber loss due to excess breakage is $768,926 (8,941,000 × $86 per MBF).

In addition to the excess breakage loss discussed above, Halsey was of the opinion that within the 800-foot strip area along the boundary line there was another severance damage element that deserved consideration. Because of the partial taking, trees on the remainder land within 250 feet of the boundary line would have to be harvested with extreme care to insure by means of special harvesting techniques that no trees fell onto park property. Such would not have been the case prior to the taking because Redwood Creek provided a buffer zone on plaintiff's eastern boundary. These special harvesting techniques, *e. g.*, wedging, jacking, etc., would engender additional costs, a fact Halsey observed would be considered by a prospective buyer and seller in negotiating a sale of the remainder land. *See* in this regard note 9, *supra*. Consideration of such excess costs is deemed appropriate in this case. *See Potts v. United States*, 130 Ct.Cl. 88, 92, 126 F.Supp. 170, 172 (1954), *Oregon Mesabi Corp. v. C. D. Johnson Lumber Corp.*, 166 F.2d 997, 1002, 1003 (9th Cir. 1947), *cert. denied*, 334 U.S. 837, 68 S.Ct. 1494, 92 L.Ed. 1762 (1948).

Halsey estimated, based on his investigation of data pertinent to this 250-foot strip area along the 12-mile boundary line, that this area contained 10,348,000 BF of net timber which would require special harvesting methods and attendant additional costs. Halsey estimated this additional cost to be $3.50 per MBF. Such a figure would produce total extra costs of $36,218 (10,348,000 × $3.50 per MBF), which are considered directly attributable to the necessity of utilizing special harvesting techniques because of the partial taking. Halsey's approach here seems reasonable and acceptable.

On the 521 acres that Halsey believed a prospective buyer and seller would tractor log, Halsey noted that the boundary line established by the taking was such as to require some uphill logging. This was so because the irregular park boundary line was drawn without regard for topography. Uphill tractor logging does entail additional costs, which Halsey estimated to be $2 per MBF. This cost figure took into account the fact that not all of this acreage required uphill logging. Since Halsey estimated these 521 acres contained 43,040,000 BF of net timber, the additional logging costs on this acreage would amount to $86,080 (43,-040,000 × $2 per MBF), a sum Halsey believed a reasonable buyer and seller would

---

23. Halsey did not include windthrow breakage in his analysis because he correctly, in my opinion, felt the affected areas would be cable logged clear-cut. Accordingly, it is my opinion a reasonable prospective buyer and seller of the remainder land in question would not anticipate nor include windthrow damage as an evaluation factor. Windthrow damage generally does not occur in areas logged clear-cut. Such damage can occur, depending on the locations of the timber stands in relation to the prevailing winds, in areas that are selectively logged.

consider as depreciating remainder land value as of October 2, 1968. Halsey's approach here is deemed reasonable and acceptable.

The parties agree that cable logging is more expensive a harvesting operation than tractor logging. The parties are in wide disagreement as to the cost spread between these two logging methods. There was conflicting evidence in the record on the matter. On balance, I am persuaded by Halsey's opinion, based on his redwood experience, that, on average, cable logging in a clear-cut manner on or about October 2, 1968, would cost $4 more per MBF than tractor logging. As indicated previously, Halsey anticipated that 545 acres along the park boundary line would be cable logged. This acreage contained an estimated 89,-410,000 BF of net timber. The additional costs, in Halsey's opinion, which a prospective buyer and seller would anticipate because this acreage would have to be cable logged as a result of the partial taking would be $357,640 (89,410,000 BF × $4 per MBF).

Both Kleiner and Halsey believed that the partial taking and the establishment of the irregular boundary line would increase logging supervision costs along the boundary line on the adjacent remainder lands. However, each approached the calculation of appropriate severance damages to reflect this element in a different manner.

Halsey approached the problem in terms of the need for an extra forester in this area until the timber was harvested. He envisioned the use of a forester full time, at $20,000 per year, for a 5-year period, or the use of a forester part time, at $10,000 per year, for a 10-year period. In either case, the result would produce additional costs of $100,000 for extra logging supervision resulting from the partial take.

Kleiner, on the other hand, computed extra supervisory expense on the basis of cost per MBF. For example, in sensitive area 5, which will be discussed, *infra*, where Kleiner anticipated cable clear-cut logging, Kleiner estimated additional supervisory costs of $0.18 per MBF;[24] in the Redwood Creek watershed areas outside the sensitive areas, which it was anticipated would be tractor logged clear-cut, Kleiner estimated additional supervisory costs of $0.34 per MBF.[25]

The presentations of the parties relative to determination of extra supervisory costs left much to be desired. Neither presentation was persuasive in totality. However, it seems reasonable to conclude that additional logging supervision would be required along the remainder land boundary line as a result of the partial taking. Such a finding justifies an allowance of severance damages in some amount. *See Cities Service Gas Co. v. United States, supra,* 217 Ct.Cl. at ——, 580 F.2d at 437–38. Utilizing Halsey's severance damage approach, *i. e.,* 521 acres to be tractor logged and 545 acres to be cable logged clear-cut, and accepting plaintiff's supervision cost estimates, *supra,* an estimate of extra supervision costs of $30,727 is obtained (tractor log area—521 acres containing 43,040,000 BF × $0.34; cable log

---

**24.** Plaintiff also seeks to recover $0.84 per MBF for increased costs of road amortization and maintenance because of cable logging clear-cut in sensitive area 5. On this record, this computation is more speculative than realistic. It need only be said that generally less roads are built for cable logging operations than for tractor logging operations.

**25.** The $0.34 per MBF cost utilized by Kleiner included $0.16 per MBF as a cost for erosion control measures which arguably could be viewed as not applicable to SA 4. However, as indicated earlier there were soil problems in some parts of SA 4 and also some anticipated uphill tractor logging which supports use of the $0.34 per MBF cost figure. It should be noted

here that there is no basis on this record for a severance damage award based on logging in areas outside the sensitive areas designated by plaintiff in any event. The record suggests that plaintiff's logging operations in these areas would be as careful and prudent subsequent to October 2, 1968, as they were prior to that date. Further, State Forest Practice Regulations in effect on October 2, 1968, were directed at controlling logging efforts in and about creek and stream areas so as to preclude erosion and water pollution. Protection of streams and creeks was a normal logging supervisory obligation and a practice followed by prudent and responsible timber operators prior to October 2, 1968.

area–545 acres containing 89,410,000 BF × $0.18). Admittedly this approach has flaws in it. However, on this record, and in view of the manner in which the parties presented their positions on an "all or nothing" basis, it was the best the trial judge could do with what he had. It is felt that it represents a fair and reasonable resolution of the matter.

In summary, the parties are in general agreement that severance damages are appropriate relative to remainder lands along the western boundary of the park. The parties disagree as to the scope of said damages. The record is conflicting on many of the factors germane to a severance damage determination in this remainder land area. It is my opinion that Halsey's approach to severance damage is more attuned to case law, and it is my best judgment, on the totality of this record, that his severance damage analysis is more reasonable and thus more persuasive. *See United States v. Miller, supra,* 317 U.S. at 374–75, 63 S.Ct. at 280; *United States v. Smith,* 94 U.S. 214, 219, 24 L.Ed. 115 (1876). Plaintiff is entitled to severance damages emanating from the partial taking and related to the remainder lands adjacent to the park's western boundary line in the amount of $1,279,591, consisting of $768,926, representing the value of timber lost because of excess breakage due to cable logging; $36,-218, reflecting excess costs attributable to the utilization of special harvesting techniques; $86,080, manifesting excess costs related to uphill tractor logging; $357,640, indicating excess cable logging costs; and

$30,727, reflecting the necessary costs of additional logging supervision.

Sensitive area 5, as identified by Kleiner, consisted of a series of land segments all of which were within the boundary of the Big Lagoon tract, except for two land segments which were east of the tract and completely surrounded by land owned by another timber company.[26] Sensitive area 5 was designed by Kleiner to embrace remainder land property owned by plaintiff which was located on Redwood Creek or located in the watersheds of streams which drained into Redwood Creek. It is important to note that SA 5 was located away from the park. As designated by Kleiner, SA 5 contained some 5,336.7 acres and was estimated to contain 853,065,000 BF of net timber volume. While not crystal clear in the record, it would appear that most of Kleiner's SA 5 acreage was uncut as of October 2, 1968, and said acreage contained a large volume of old-growth timber. The record further supports a view that the areas included in SA 5, as of October 2, 1968, appeared to be in generally good condition with no major erosion events predictable. However, there were areas where soil problems and land slippage possibilities were present.

Plaintiff seeks to recover in sensitive area 5 category 1 severance damage of $16,367,-629.50, based on the value of anticipated lost timber because this area would have to be cable logged in a clear-cut fashion,[27] and category 2 severance damage of $8,742,917, based on anticipated extra costs which would be associated with cable logging this area as well as extra cost for additional

---

**26.** Defendant does not argue against inclusion of these two separate, noncontiguous, land segments in any severance damage consideration. *See United States v. Miller,* 317 U.S. 369, 376, 63 S.Ct. 276, 281, 87 L.Ed. 336 (1943). It seems established that it is appropriate to consider alleged loss in value of noncontiguous land, in circumstances such as are present in this case, where a unitary purpose, commercial timber operation, is served by all involved land segments. *See United States v. Honolulu Plantation Co.,* 182 F.2d 172, 179 (9th Cir. 1950); *Baetjer v. United States,* 143 F.2d 391, 394–95 (1st Cir. 1944).

**27.** It is interesting to note the contrary to the anticipation of Kleiner's buyer and seller that sensitive areas 1, 2, 3, and 4 would be cable logged selectively, Kleiner believed a buyer and seller would anticipate cable logging SA 5 in a clear-cut manner because SA 5 was more distant from the park and less visible to the public. Accordingly, clear-cut operations in SA 5 would not have an impact on park visitors and others such as to generate public concern which might push the Secretary to take retaliatory action against remainder land property. Since Kleiner believed SA 5 would be clear-cut, he agreed that windthrow damage would not be considered as a value depreciating factor by a buyer and seller.

logging supervision to insure that harvest operations in the area did not damage the park.

Kleiner believed that all of SA 5 would have been tractor logged in a clear-cut manner prior to the date of taking. I am persuaded, on the basis of this record, that a prudent timber operator, before and after October 2, 1968, would anticipate both clear-cut cable logging and tractor logging operations on SA 5 depending on topographical and soil conditions and the exercise of sound forest harvest and management judgment practices.

Kleiner's rationale for SA 5 severance damage rests heavily on a buyer and seller's reading of section 3(e) of the Park Act, *supra*, as well as H.R.Rep.No. 1630, part of the legislative history of said Act, wherein the concerns of Congress are expressed as to the possible effects logging operations in the areas embraced by SA 5 might have on the parklands and waters. Kleiner believed that a prospective purchaser of SA 5, aware of congressional concern for the park, would feel compelled to cable log these areas to hold down land erosion and slippage which tractor logging would exacerbate, and to provide additional supervision to insure that the creeks and streams were not degraded by logging operations. A prospective purchaser, according to Kleiner, would feel compelled to cable log instead of tractor log SA 5 because of possible retaliatory actions by the Secretary and/or Congress. These anticipated fears, on this record, are too remote and speculative to serve as a basis on which remainder land depreciation in value can be considered. *See Olson v. United States, supra.* Rather paradoxically, Kleiner felt that in the upper reaches of streams in the watershed areas, on favorable terrain, a prospective purchaser would feel free to tractor log.

Halsey and Wallen did not consider the watershed areas outside the park, which areas were controlled by the State's Forest Practice Rules in effect on October 2, 1968, as providing a basis for severance damage. They saw nothing in the Act, or its legislative history, that restricted harvesting tim-

ber in the drainage areas to cable logging. They felt that the hope of the Act and the legislative history was that landowners would employ good management practices for their own sake and for the sake of the park in the watershed areas outside the park. Parenthetically, it would be in the best interest of a timber company to engage in responsible and prudent harvesting practices since protection of the soils from erosion would mean, in the future, a better second-growth timber crop. In the view of Halsey and Wallen, a landowner could proceed to log these drainage areas subsequent to October 2, 1968, in the same manner those areas would have been logged prior to that date. Kleiner admitted that in some portions of the SA 5 drainage areas one would have had to cable log prior to October 2, 1968. Halsey and Wallen pointed out that any logging operation, cable or tractor, disturbs the soil. While use of cable logging generally disturbs the soils less than tractor logging, prudent logging operations can minimize erosion, stream siltation and stream debris regardless of the harvesting method used. More importantly, the State's Forest Practice Rules in effect on October 2, 1968, contained provisions dealing with erosion control practices and procedures which required careful logging operations, cable and/or tractor, in and about watershed drainage areas. These rules also prohibited stream pollution. Kleiner agreed that the Forest Practice Rules in 1968 contained provisions for stream protection and that logging practices under these rules were designed to protect streams. Moreover, he agreed it was the custom of the forest industry in 1968 in the redwood area at that time to protect the streams. Kleiner testified that timber companies in 1968 did strive to protect the streams, and while they tractor logged areas next to streams they were required to take erosion prevention measures to reduce the amount of soil that might wash into streams during logging activities. Kleiner conceded that prior to 1968 greater care was required when logging around streams than was required if logging elsewhere. Kleiner admitted that prior to October 2, 1968, landown-

ers that had streams or creeks running through their lands could object to upstream pollution activities.

Sensitive area 5 was logged subsequent to October 2, 1968. Some areas were cable logged, other areas were tractor logged. Close examination of a 1974 aerial mosaic photograph of watershed areas on the west side of the park indicates that more of these areas were tractor logged than cable logged. On this record, there is no indication that fear of retaliatory action by the Secretary and/or Congress caused those areas which were cable logged subsequent to October 2, 1968, in SA 5 to be cable logged. Rather it appears reasonable to conclude that management's decision to cable log these watershed areas was motivated largely by topographical and soil conditions as well as sound and prudent forest management practices.

Giving due regard to the totality of a conflicting record, the anticipations of Kleiner's prospective purchaser and seller do not persuade that a hypothetical sale would ensue based thereon on October 2, 1968. A more reasonable approach, relative to a prospective purchaser and seller, is that both would realize that the harvesting method to be utilized in SA 5 would depend on factors such as topography, soils, good management practices, etc. As a result it is found that on October 2, 1968, a reasonable and prudent purchaser and seller would conclude that logging in the drainage area would involve both tractor and cable logging. Further, both would anticipate closer supervision of logging activities in these drainage areas to avoid stream pollution. On this analysis there would be no anticipation of change in harvesting methods in SA 5 as a result of enactment of Pub.L.No.90–545 on the part of either the prospective purchaser or seller.

### Category 3 Severance Damage

Rickard was the principal expert witness relative to plaintiff's category 3 severance damage claims. He believed that because of the partial taking of plaintiff's land, and the use of that land as part of a national park, a prospective purchaser of plaintiff's remainder lands on October 2, 1968, would conclude that certain forest management timber growth practices would not be available in the future for implementation on said remainder lands because of the park's presence. These forest management practices, according to Rickard, were the use of 1) herbicides to control brush and hardwood growth which would otherwise compete with young-growth redwood tree stands; 2) fertilization to promote and maintain maximum young redwood tree growth; and 3) precommercial thinning to obtain maximum growth space for young redwood trees.

The practices set forth above were known generally to the forest industry in 1968. However, they were not widely used in the redwood region on October 2, 1968. Rickard believed these management practices would assist in the development of young-growth (or second-growth) redwood trees. He further believed a landowner's inability to utilize these practices subsequent to October 2, 1968, would result in anticipated lower timber volume yields in future years. These anticipated lower timber volume yields in future years would cause a buyer and seller of the remainder lands, in Rickard's view, to depreciate the value of said lands in negotiating a sale thereof as of the date of taking.

Plaintiff's category 3 severance damage claim was based on an annual timber growth volume loss of 13,486,000 BF, which Rickard valued at $100 per MBF, computed over a period of 18.5 years so as to produce an anticipated severance damage loss of some $4,000,000 as of October 2, 1968. Plaintiff attributes this future loss to anticipated restrictions on the use of the above-mentioned practices on the remainder lands resulting solely from the partial taking of its lands and for which it makes claim herein.[28]

---

28. Rickard felt that the old-growth redwood timber on the remainder land would be expected to be exhausted in 18.5 years and it would be at that future time that the owner of the remainder lands would be dependent on second-growth timber. Accordingly, Rickard

Rickard believed the entire remainder land area, with an estimated acreage of 89,907 acres, would be affected by the lack of herbicide use; that some 33,315 acres in the Redwood Creek drainage area would be affected by the lack of fertilizer use; and that some 34,685 acres in the Redwood Creek drainage area, including sensitive areas 1, 2 and 3 designated by Kleiner, would be affected by the lack of precommercial thinning. There was some overlap in these affected areas. Rickard estimated the annual growth loss which could be ascribed to each of these anticipated restricted practices as follows: herbicides–7,679 MBF; fertilization–2,845 MBF; and precommercial thinning–2,962 MBF.

Rickard's rationale for category 3 severance damage was similar to that advanced by Kleiner relative to categories 1 and 2 severance damage claims. Rickard believed that public interest in the park and the possible effect of public pressure on the Secretary and/or Congress would cause a prospective purchaser to conclude that it would be unable to utilize the forest management practices described above for fear of causing retaliatory actions by the Secretary under the provisions of the Park Act, i.

e., by additional taking of some of the remainder lands or by imposing future restrictions on use of the remainder lands.[29] On this record, these fears have not been shown to be reasonably probable as of October 2, 1968.[30] As a result, plaintiff's category 3 severance damage claims must be regarded as too remote and speculative to have a viable effect on remainder land valuation. *Olson v. United States, supra. See also* note 18, *supra*. The damages alleged are such as would not be reasonably foreseeable by either party at the time of the partial taking and thus are not recoverable. *See First National Bank of Brunswick v. United States*, 350 F.2d 606, 608 (5th Cir. 1965). It is clear, on this record, that the Secretary, subsequent to October 2, 1968, had no authority to preclude owners of land surrounding the park from engaging in the forest management practices here under discussion. *See* note 13, *supra*. Further, there were no restrictions, directly or indirectly, imposed by the Secretary at any time on the forest management practices that could be followed by owners of land near the park subsequent to October 2, 1968. *Compare Pete v. United States*, 209 Ct.Cl. 270, 297–98, 531 F.2d 1018, 1034–35

believed the growth volume loss in timber would not be realized until then. The value of this annual growth loss would begin, in Rickard's computation, in mid-1986 and continue thereafter in perpetuity. His computation capitalized the future annual growth loss at 8 percent. Plaintiff's severance damage computations are more speculative and conjectural than real. It is believed that the relationship between the partial taking and the damage claimed is too remote and thus consequential in nature. As such, no compensation would be due plaintiff. *See Cotton Land Co. v. United States*, 109 Ct.Cl. 816, 829, 75 F.Supp. 232, 233 (1948); *Avery v. United States*, 165 Ct.Cl. 357, 364–66, 330 F.2d 640, 644–45 (1964). *See also United States v. General Motors Corp.*, 323 U.S. 373, 379 (1945); *Klein v. United States*, 179 Ct.Cl. 910, 915, 375 F.2d 825, 829 (1967), *cert. denied*, 389 U.S. 1037 (1968); *United States v. 91.90 Acres of Land*, 586 F.2d 79, 87–88 (8th Cir. 1978).

**29.** Rickard had no experience in the redwood region or with redwood forest management practices prior to 1973, at which time he was engaged by plaintiff to work on the appraisal report in this case. This appraisal endeavor

has been his total redwood experience. Rickard did not know whether plaintiff utilized the management practices here in issue on or prior to October 2, 1968. There is no hard evidence in the record that plaintiff utilized these practices on its redwood timberlands either before or after October 2, 1968, although Rickard testified that while on plaintiff's remainder lands subsequent to 1973, he saw areas where herbicides apparently had been applied.

**30.** Neither Halsey nor Wallen, both of whom were most experienced in the redwood region before and after October 2, 1968, envisioned any such forest practice restrictions on the remainder lands after October 2, 1968. Rickard, in his testimony, advised that the Stone Report, based on knowledge available prior to October 2, 1968, refers to precommercial thinning and fertilizers as viable forest management practices. This report encouraged their use on cutover lands surrounding the park in order to speed up tree development and cover in these areas. No mention was made in this report regarding herbicides.

(1976); *United States v. Coughlin*, 405 F.Supp. 13 (D.Ore.1975).[31]

■ The record supports the conclusion that, as of October 2, 1968, a reasonable and knowledgeable buyer and seller of plaintiff's remainder lands would not consider as an evaluation factor in negotiating a sale of said lands the use or nonuse of herbicides, fertilization and precommercial thinning. Both buyer and seller would assume that these practices could, if desired, be utilized in a prudent and responsible manner relative to plaintiff's remainder lands subsequent to October 2, 1968.

### 1) Herbicides

The record preponderates in favor of a finding that as of October 2, 1968, herbicide use in the redwood region was very limited. Herbicides were apparently used in the redwood region on a test basis from 1960 up to 1968 to see if herbicide use could accelerate timber growth. Kleiner testified that herbicides were used in the redwood region in 1968 primarily to control weeds and overhanging brush along roadsides. Rickard believed that the public in 1968 perceived that use of herbicides posed a danger to people and wildlife, a perception he personally did not hold. However, Kleiner testified he was unaware of any strong public concern over the use of herbicides as of the date of taking. The record suggests that use of herbicides in many areas of plaintiff's remainder lands would be of doubtful vitality, in any event, because of ideal conditions for second-growth timber development in said areas.

In Wallen's opinion, contrary to the opinion voiced by Rickard, it had not been proven as of October 2, 1968, that the use of herbicides in the redwood region would increase the timber yield of redwood or that the absence of use of herbicides would impair or reduce the timber yield of redwood. Rickard's views were based on information Kleiner received from Simpson Timber Company expressing its opinion in a 1977 letter that use of herbicides increased the rate of growth of young conifer trees. No official of this company testified as to this opinion. As to Rickard's reliance on this company's opinion *see 6816.5 Acres of Land v. United States*, 411 F.2d 834, 839–40 (10th Cir. 1969). The redwood experience of Wallen renders his opinion more acceptable than Rickard's in this regard. I am persuaded that herbicides would not be considered a value factor by a reasonable and knowledgeable buyer and seller of the remainder property as of the date of partial taking.[32]

**31.** It would seem reasonable to conclude, viewed from the position of a prospective buyer and seller, that responsible and prudent use of the forest management practices in question on the plaintiff's remainder lands subsequent to October 2, 1968, would not generate retaliatory Secretarial action. Indeed, the record indicates that plaintiff advised government officials in January 1969 that they would oppose harvesting or management restrictions in any areas on the remainder lands adjacent to the park and were subsequently advised that the National Park Service did not wish to do anything that would interfere with company operations. In this regard, it is noted that the United States Forest Service used herbicides in the Six Rivers National Forest in California and in the Siskiyou National Forest in Oregon in 1968. Further, the Forest Service conducted precommercial thinning studies in the Northern Redwood Purchase Unit and supported such a forest management practice. The record suggests that Simpson Timber Company, which shares over 25 percent of the park boundary line had, subsequent to October 2, 1968, been using fertilizers and herbicides, and engaging in precommercial thinning operations on its timberlands in the vicinity of the park without apparent public clamor or evidence of Secretarial displeasure. Some years have passed since the 1968 partial taking and no evidence exists that the anticipated restrictions on which category 3 severance damage claims are premised were realistic or probable. No such federal restrictions on use of these forest management practices on lands adjoining the park have surfaced to date. This fact supports denial of such claims. *See United States ex rel. T. V. A. v. T. Industries, Inc.*, 489 F.2d 921, 925 (6th Cir. 1974). Whether state or local restrictions on use of herbicides on private timberlands have surfaced is not revealed in the record. Such actions confirm the conclusions reached herein as to the views of a prospective buyer and seller of plaintiff's remainder land on the date of taking.

**32.** Herbicides would have no usefulness in old-growth redwood areas. Its usefulness, if any, would only be in cutover lands to control brush

## 2) Fertilization

Fertilizer is sometimes used to accelerate the growth of trees. Rickard's tree fertilization experience was in the Douglas fir region, not in the redwood region of California. He was not personally aware of any favorable results associated with the use of fertilization in the redwood region. Like herbicides, Rickard viewed a remainder landowner spreading fertilizer by aircraft over the property subsequent to the date of taking. There is absolutely no evidence in the record that this was done in the redwood region in 1968. Rickard believed great care would be required in dropping the fertilizer pellets from aircraft in order to avoid having them fall into streams, creeks and waterways.

After the park was created, a prospective purchaser, according to Rickard, would realize that application of fertilizer by aircraft anywhere in the Redwood Creek watershed area would carry a danger of contaminating Redwood Creek which ran through the park.[33] Further, the continual passes of aircraft back and forth over remainder land areas would be considered an annoyance and noise intrusion on the pristine character of the park. Accordingly, Rickard believed a prospective purchaser would conclude he would be unable to apply fertilizer in the Redwood Creek watershed areas on the remainder land because of fear of retaliatory action by the Secretary, as discussed earlier (see notes 13 and 14, and text, supra), if such were done. Such fears, as stated earlier, are considered to be unfounded and have

and hardwoods to avoid competition with young-growth conifers such as redwood. Herbicides turn brush brown and an area subject to its use would be rendered unattractive for a period of time. This unattractive result would, according to Rickard, turn public opinion against herbicide use on lands surrounding the park and possibly force retaliatory Secretarial action. Rickard envisioned aerial application of herbicides. This would increase the danger, according to Rickard, that prevailing winds would carry herbicides into the park. As of October 2, 1968, there was no aerial application of herbicides in the redwood region as far as this record is concerned. The record indicates that Simpson Timber Company began applying herbicides to large areas of its timberlands by aircraft beginning in 1969. There is no evidence in the record that such activity alienated the public and/or the Secretary. In United States v. Baker, 279 F.2d 603, 606 (9th Cir. 1960), relied on by plaintiff, the court was speculating as to what a jury might have considered in rendering a general verdict in a condemnation case. The court observed, conceding it was impossible to tell if the jury awarded severance damages, and if they did so on what grounds, that the proximity of a housing development on taken land (132.4 acres) surrounded by 380.6 acres of remainder truck and cotton farmland may have presented the owner of the remainder land with problems in dusting his farmland with chemicals. This same problem could be said to have existed, prior to the date of taking, if aerial herbicide spraying of plaintiff's remainder land took place near the town of Orick and along Highway 101. Aerial spraying, whether herbicides or fertilizer, performed in a responsible and prudent manner may well be an acceptable practice in a forest or farm environment. There were no physical obstacles on the parklands such as high power trans-

mission lines which would render aerial herbicide spraying on remainder land areas adjacent to the park dangerous. Cf. United States ex rel. T. V. A. v. T. Industries, Inc., supra, 489 F.2d at 925.

33. Plaintiff's argument rests on the unfounded assumption that use of fertilizer in these watershed areas would be restricted by the Secretary. As pointed out earlier, the Stone Report in 1969 encouraged the use of fertilizer in cutover areas to accelerated growth coverage of said areas. Further, some years have passed since the park was created and no such restriction has been issued or intimated by the Secretary. See notes 30 and 31, supra. More importantly, state forestry regulations, in effect in 1968, prohibited pollution of waterways by timberland owners. Halsey and Wallen noted that these watershed areas outside the park were controlled by the State's Forest Practice Rules in 1968. These state regulations in effect in 1968 ostensibly would prohibit contamination of the waterways in question by fertilization pellets. In January 1969, plaintiff, in advising the National Park Service that it would oppose any restrictions on its timber operations, noted that these state regulations adequately protected the park from any damage. It should be observed that no compensable event would have occurred if the Secretary had lobbied that state under its police powers to make their forest regulations more stringent so as to restrict management practices in the Redwood Creek watershed areas. See De-Tom Enterprises, Inc. v. United States, supra. As to state police powers see Penn Central Transportation Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

not been shown to have reasonable probability as of the date of taking.

Wallen was aware that fertilization was utilized by some timberland owners in 1968. However, he knew of no one in the redwood region in 1968 who was fertilizing redwood timberlands. He conceded that someone may have been doing it, but if so, he was not aware of it. Wallen pointed out that the Redwood Creek watershed areas were perhaps the most fertile of the forestland areas and therefore were areas least likely to require fertilization. It is concluded that fertilization would not be considered a value factor by a reasonable and knowledgeable buyer and seller of the remainder property as of the date of taking.

### 3) *Precommercial thinning*

Precommercial thinning involves removal of young trees of no commercial value in order to give young trees with commercial value space to grow. Thinning operations sometimes result in the cutting of substantial portions of overstocked tree stands. When an area is thinned of noncommercial trees, the cut trees turn brown, in time, and create an unappealing sight by presenting an area appearance of having been logged or burned. Rickard believed such sights would have a negative impact on park visitors. Further, such dead materials would be viewed as fire hazards by visitors to the park. After the park was established, a prospective purchaser of plaintiff's remainder lands would conclude, according to Rickard, that he would not be able to engage in precommercial thinning in certain areas of the remainder lands which were visible from the park or the highways, or in the Redwood Creek drainage areas for fear of inducing retaliatory action by the Secretary as discussed previously (*see* note 13 and note 14, and text, *supra*). Such fears, as indicated above, are deemed unfounded

and have not been shown to have reasonable probability as of the date of taking.

Wallen was not aware of any precommercial thinning operations of any significance taking place in the redwood region in 1968 or prior thereto. There is some evidence in the record that Simpson Timber Company began to experiment with precommercial thinning in the redwood region as a possible tree acceleration growth practice in 1970. This record supports the conclusion that a reasonable and knowledgeable buyer and seller of plaintiff's remainder land on the date of partial taking would not consider as a value factor the practice of precommercial thinning.

### Category 4 Severance Damage

Mater was the expert witness for plaintiff as to its category 4 severance damage claim although the rationale for the claim was provided by Kleiner and Rickard. As indicated previously, plaintiff, as of October 2, 1968, owned and operated a number of mills and manufacturing facilities at Samoa, California, as well as a sawmill on the Big Lagoon tract, the operations of which relied on timber from plaintiff's lands in California, principally the Big Lagoon tract and other timberlands in Humboldt County. As a result of the partial taking of some 3,368 acres of timberlands, leaving as a remainder over 84,000 acres of timberlands, plaintiff claims that two of its facilities, the Samoa redwood sawmill and the Samoa pulpmill, suffered severance damages.[34] Plaintiff seeks to recover $1,902,331 as category 4 severance damage.

The Samoa redwood sawmill (hereinafter sawmill) was designed and utilized for the conversion of old-growth redwood timber into lumber. It could not handle small timber, such as second-growth redwood or other small timber species. It could, however,

---

**34.** Wallen believed three of plaintiff's facilities merited severance damage consideration, *i. e.*, the Samoa redwood sawmill, the Samoa studmill and the Big Lagoon salvage sawmill. Plaintiff makes no claim for severance damages as to the studmill and the Big Lagoon sawmill because these mills did not depend on old-growth redwood timber for their operations

and were adaptable for handling all types of timber species. Accordingly, Kleiner and Rickard correctly concluded they would not be affected by any reduction in the availability of old-growth redwood timber and therefore suffered no severance damages. These conclusions are supported by the record.

handle extremely large Douglas fir trees. To handle smaller timber, this sawmill would have to be redesigned. Neither Kleiner, Rickard, nor Mater, gave any consideration to redesigning this sawmill to handle other types of timber. The sawmill was constructed long before 1964, and had been improved and updated from time to time. According to Wallen, it was one of the older sawmills in the redwood region. In 1968, the sawmill obtained most of its old-growth redwood timber from the Big Lagoon tract and processed an average of 334,000 board feet of logs per day. As of December 31, 1968, the book value of this sawmill was $7,982,321.32 with a reserve for depreciation of $6,485,494.41.[35] On the assumption that the sales price of the sawmill would be around 50 percent of book value, Mater computed an assumed sales price of the sawmill as of October 2, 1968, to be $4,542,311. Mater's evaluation did not involve a physical appraisal of the sawmill. He did not inspect the sawmill for the purpose of his severance damage analysis. Mater computed the sawmill's severance damages to be $1,004,759.

The Samoa pulpmill was constructed new in 1965. It utilized a variety of wood chips in its operations. Production from the pulpmill in 1968 totaled some 178,182 tons. In 1968, the mixture of wood chips utilized in the pulpmill operation included old-growth redwood chips. Mater was advised that this mixture consisted of 16 percent old-growth redwood chips and 80 percent other timber specie chips, including young-growth redwood chips. Mater, since he was not asked to do so, did not consider the possibility of the pulpwood operation utilizing wood chips other than old-growth redwood in his analysis. Yet, he assumed that after the period he utilized in his analysis expired, some 23 years later, substitute chips for old-growth redwood would be available and utilized for the pulpwood mixture. His severance damage computations and opinion rested on the assumption that old-growth redwood chips were necessary for the mixture. He never inquired, nor did he know, why they were necessary.[36] Mater computed the pulpmill's severance damages to be $897,572. The record fails to establish that old-growth redwood chips were essential for the pulpwood mixture. Instead, the record persuades that other timber specie chips were and probably would be available for continued long-range operation of the pulpmill.

For reasons discussed above, it is found that the Samoa redwood sawmill is the only facility of plaintiff that deserves severance damage consideration.

The record establishes that the value of a sawmill is dependent on the availability of a timber supply to keep the sawmill operating. Kleiner and Rickard's rationale for severance damage for the Samoa redwood sawmill rested on the view that the useful life of the sawmill was decreased because of the partial taking in issue. The paramount factor in the thinking of Kleiner and Rickard was that old-growth redwood was a

35. Mater did not consider depreciation in his severance damage approach since his useful life analysis was not based on depreciation but on timber availability.

36. Wallen believed the pulpmill suffered no severance damage because pulpwood materials, wood chips of various timber species, were, and most probably would be, available on and after October 2, 1968. The evidence shows that old-growth redwood chips were utilized in the pulpmill operation, along with other timber specie chips before and after the date of partial taking. Mater assumed that the loss of old-growth redwood chips would not, in any event, impact on pulpmill operations for some 20 years. To the extent that old-growth redwood chips at some future time after 1968 became unavailable, other timber specie chips most probably would be available for utilization in the pulpwood mixture without any detriment to the mixture. See United States v. 7936.6 Acres of Land, 69 F.Supp. 328, 331 (D.P.R.1947). The record, in totality, supports a finding that the pulpmill would not suffer any severance damage at any time. It is established the pulpmill would not suffer any damages, in any event, within a reasonable period of time after the partial taking. A conclusion that severance damages might occur in the future, under the circumstances of this case, would be speculative as to the pulpmill since it has not been shown to be based on reasonable probabilities. See Olson v. United States, supra, 292 U.S. at 257, 54 S.Ct. at 709.

finite resource. Kleiner provided Mater with data and estimates which enabled him to compute the indicated useful operating life of the sawmill, prior to the partial taking, to be 23.82 years. That is to say, the old-growth redwood timber on plaintiff's Samoa Division timberlands before October 2, 1968, based on the annual average timber cut of 115,063 MBF per year, would keep the sawmill operating for 23.82 years. Kleiner also supplied Mater with data and estimates which enabled him to compute the indicated useful operating life of the sawmill, after the partial taking, to be 18.55 years. These figures produced a reduction in the useful operating life of the sawmill of 5.27 years, or a 22.12 percent reduction in said useful operating life, based on the decrease in old-growth redwood timber volume due solely to the partial taking. Mater multiplied the 22.12 percent useful life reduction by $4,542,311, the assumed 1968 sawmill sales price which Mater computed based on the allocated book value of the sawmill in 1968, to arrive at his sawmill severance damage reduction in value figure of $1,004,759.[37]

Wallen recognized that the value of a sawmill was related to the timber supply available to it. He approached the matter of mill facility severance damages by determining the decreased timber base which plaintiff would have, after the October 2, 1968, taking, to amortize fixed mill investment costs. Wallen utilized, in his approach, depreciation figures from plaintiff's accounting records covering facility operations. Wallen lumped three mill facilities together in his analysis of severance damages. Wallen and Halsey offered a number of mill facility severance damage figures ranging from a low of $321,000 to a high of $614,500. Since two mills have been deemed herein not to have suffered severance damages, some difficulty was encountered in extrapolating figures which would provide a Wallen severance damage figure for the Samoa sawmill only. Plaintiff's books reflected a depreciation figure of $5.78 per MBF for the Samoa redwood sawmill for 1967 operations. It is to be noted that this depreciation figure could change if new equipment was added or the sawmill was otherwise improved. The record suggests Wallen's severance damage figure for this sawmill alone would be $899,877.[38]

It is important to note that the sawmill, under plaintiff's severance damage theory and attendant computations, would not suffer any impact, viewed either as a complete shutdown or as an uneconomic overcapacity, on operations until some 18.55 years after the partial taking in issue, or until after 1980. Given the large volume of old-growth redwood timber on the remainder lands after the partial taking, I am not

---

**37.** Kleiner estimated that the taking of 3,368 acres removed 364,004 MBF of old-growth redwood timber. Kleiner estimated that under his category 1 and 2 severance damage conclusions, there would be an additional loss of 242,764 MBF of old-growth redwood as a result of breakage and windthrow factors. His total timber volume loss, which he attributes to the partial taking, amounts to 606,768 MBF of old-growth redwood. It has been found herein that the appropriate figure for severance damage timber loss is 8,941 MBF of old-growth redwood. Substituting this 8,941 MBF figure for Kleiner's 242,764 MBF figure, *supra*, results in a reduction of Mater's useful operating life loss figure from 5.27 to 3.25 years and a reduction in Mater's severance damage determination from $1,004,759 to $618,662.75. If severance damages were deemed appropriate relative to the Samoa redwood sawmill on the theory advanced by plaintiff, $618,662.75 would be considered the figure best supported by the record. Mater assumed that no replacement old-growth redwood would be available to plaintiff during the 18.55 years before the impact of old-growth timber loss was felt by the sawmill.

**38.** Wallen's amortization approach brings to mind the fact that plaintiff has been paid for the old-growth redwood timber taken from it, and will be paid, as a result of this proceeding, for timber volume breakage loss. It is not unreasonable to assume that this payment reflects a factor for mill amortization. Mater conceded that the life of a sawmill is sometimes amortized over the life of the timber supply. The useful operating life of the sawmill was determined by the amount of standing old-growth redwood. Thus, payment for a tree, serves to amortize its relationship to the sawmill's useful life. Viewed as a depreciation matter, it could be said plaintiff has not suffered any sawmill severance damage as to the taken timber.

persuaded that a reasonable and knowledgeable buyer and seller would devalue the sawmill on October 2, 1968, on the basis of speculation that old-growth redwood might not be available 18 years later for sawmill operations. I am not persuaded that a buyer and seller of the sawmill would conclude, as did Kleiner and Rickard, that old-growth redwood would be impossible to obtain after October 2, 1968.[39] Such a buyer and seller would undoubtedly be aware that many future events could have an effect on sawmill operations. Fire, for example, is a future risk of which a buyer and seller would not be oblivious. Further, the sawmill could be sold before the existing old-growth redwood supply, available on the date of taking, was exhausted.

Obviously many things can happen in circumstances where the incurrence of severance damages depends on uncertain future events. *See* note 5, *supra*. As of 1973, plaintiff had not suffered any severance damage to the sawmill as a result of the October 2, 1968, partial taking. The sawmill, on this record, operated exactly as it had before the taking with ample old-growth redwood available for such operations. In 1973 plaintiff transferred the assets of the Samoa Division, including the sawmill here in issue, to a new and independent corporation at book value. *See* note 3,

*supra.* As indicated earlier, Mater assumed that the sales price of the sawmill as of October 2, 1968, would be around 50 percent of its book value. An inference could be drawn from this that the sawmill, at least, was not devalued at the time of this transfer sale. In any event, there is no evidence which would indicate that this transfer sale reflected a devaluation of the sawmill as a result of the 1968 partial taking. Under such circumstances, it would not seem appropriate to pay plaintiff severance damages for the sawmill when the facts suggest rather clearly it did not and will not sustain any such damages. The concept of just compensation embodies not only fairness to the party whose property is taken, but also to the public which must bear the payment burden. *See United States v. Commodities Trading Corp.*, 339 U.S. 121, 123, 70 S.Ct. 547, 549, 94 L.Ed. 707 (1950). Fairness, under the circumstances set forth above, militates against awarding plaintiff severance damages for the Samoa redwood sawmill. Such a result expresses "a judgment from experience as against a judgment from speculation." *Tanner v. Little*, 240 U.S. 369, 386, 36 S.Ct. 379, 384, 77 L.Ed. 1449 (1916); *see* note 5, *supra*.

Wallen and Halsey agreed that to the extent old-growth redwood timber was available, subsequent to the date of taking,

**39.** Plaintiff relies on *Baetjer v. United States*, 143 F.2d 391 (1st Cir.), *cert. denied*, 323 U.S. 772, 65 S.Ct. 131, 89 L.Ed. 618 (1944), which it asserts established the standard for determining loss in value to mills and plants in partial taking situations. In *Baetjer*, certain lands used for the growing of sugar cane were condemned. The owner of said condemned lands claimed severance damage to his sugar refining mills, located on noncontiguous land which was not taken. The circuit court in *Baetjer*, in remanding the matter to the district court, observed that as a result of the taking of the mills' sugar cane supply, the mills might have experienced an uneconomic overcapacity which a willing buyer might consider in determining what he would pay for the mills. *Id.* at 396. On remand, the district court found no severance damages relative to the mills' operations after the taking because other sugar cane, although not as easy to grind, was available and utilized. While the condemnee claimed lost mill tonnage because of the unavailability of the sugar cane land taken, and the difficulty in processing the replacement sugar, the district court viewed the claim in essence as one for lost profits. *United States v. 7936.6 Acres of Land, supra*, 69 F.Supp. at 331–32. The point to be observed relative to the *Baetjer* case is that the hiatus between the taking and the claimed mill severance damage was not remote such as to substitute conjecture and speculation for reasonably probable reality. A similar observation is valid with respect to *United States v. 339.77 Acres of Land*, 240 F.Supp. 545, 549 (W.D.Ark.1965), relied on by plaintiff, where the over-capacity status of a dairy resulting from a partial taking was deemed a depreciating value factor in a severance damage context. In the case at bar, the hiatus between the date of partial taking and the anticipated damages, some 18 years later, is too long a period for reasonable probability to control and provides an inappropriately long and indefinite period for speculation and conjecture to thrive and survive. *See Olson v. United States, supra*.

sufficient to offset the timber loss occasioned by the partial taking, severance damages would not be appropriate. Mater assumed that no replacement old-growth redwood would be available to plaintiff subsequent to the date of partial taking. Kleiner advised he gave consideration to the availability of replacement old-growth redwood after the partial taking, but concluded that no reasonable replacement supply of said timber was, or would be, available for purchase. Rickard admitted that if replacement old-growth redwood was available to the sawmill after the date of taking, severance damages, under plaintiff's theory, would be affected.

Section 5 of the Park Act provided plaintiff with an opportunity to obtain replacement old-growth redwood timber from the Northern Redwood Purchase Unit. While initially receptive to obtaining replacement old-growth redwood from the Purchase Unit as part payment for the partial taking, plaintiff subsequently refused such an opportunity, preferring cash instead.[40] A reasonable buyer and seller of plaintiff's sawmill certainly would have considered the availability of this replacement timber in evaluating the sawmill. *See Porrata v. United States*, 158 F.2d 788, 790 (1st Cir. 1947). It is my opinion that both buyer and seller would recognize, in any event, that volume availability of the replacement redwood timber would serve to lessen the reduction in useful life of the sawmill that might otherwise be contemplated if such timber were not available.

The record indicates that old-growth redwood timber was available for purchase in the area of the Samoa Division subsequent to October 2, 1968.[41] Therefore, Kleiner's opinion that replacement timber was not, and would not be, available after the date of taking was shown to be incorrect. Moreover, it was not defendant's burden to prove that replacement redwood timber was available, rather it was plaintiff's burden to establish that replacement redwood timber was not available. Plaintiff incorrectly views the matter as a mitigation of damages situation, citing *T. C. Bateson Constr. Co. v. United States*, 162 Ct.Cl. 145, 188, 319 F.2d 135, 160 (1963), wherein the burden of proof as to a contractor's failure to mitigate damage was held to rest upon the defendant who asserted it. As indicated previously, plaintiff has the burden of proving that the value of the remaining property was depreciated because of the partial taking. *See* page 11, *supra*. This burden embraces proof, under the circumstances of this case, that replacement old-growth timber was not available, or if available, at least, the burden to show per-

---

**40.** It was estimated that plaintiff could have obtained some 105,612,000 BF of net redwood timber volume of which some 103,507,000 BF was old-growth redwood, 1,700,000 BF was residual redwood timber, and 405,000 was young-growth redwood timber. Plaintiff suggests that such replacement timber was of inferior quality, would involve additional costs in processing, etc., such that it should not be considered as affecting any severance damage award here. The significant fact is that replacement timber was available. The matters plaintiff refers to in opposition to consideration of such timber availability relate to the factor of profitability, which cannot be considered in severance damage considerations. *See United States v. 7936.6 Acres of Land, supra*, 69 F.Supp. at 331–32. It is to be remembered that the thrust of plaintiff's claim is that the useful operating life of the sawmill was reduced by the partial taking. Replacement timber limits or precludes any such reduction and provides the owner with the opportunity for continued sawmill operations.

**41.** As of 1973, when plaintiff transferred the assets of the Samoa Division by sale to the Louisiana-Pacific Corp., plaintiff had been paid, for the partial taking, some $31.8 million. This money could have been utilized to purchase additional old-growth redwood timberlands. Indeed, Wallen testified and it was not denied, that plaintiff subsequent to 1968 did purchase additional redwood timberlands in California. These purchases were major ones, according to Wallen, which more than replaced the volume of redwood timber taken from plaintiff. While these purchases were made by a division of plaintiff's other than the Samoa Division, and was outside the operational area of the Samoa Division, they do indicate the general availability of redwood timber in California subsequent to 1968. The record is silent as to whether any of the $31.8 million referred to above was utilized in the purchase of these additional redwood timberlands.

suasively that under existing circumstances it would be economically unfeasible to obtain available replacement timber. *International Paper Co. v. United States*, 227 F.2d 201, 207 (5th Cir. 1955); *United States v. 711.57 Acres of Land*, 51 F.Supp. 30, 33 (N.D.Calif.1943), *appeal dismissed*, 144 F.2d 355 (9th Cir. 1944). Plaintiff failed to carry its burden in this regard.

 For any one or all of the reasons discussed above, it is my judgment that an award of severance damages relative to the Samoa redwood sawmill would not be appropriate in this case.

### Category 5 Severance Damage

 Rickard was plaintiff's principal expert witness as to category 5 severance damages. This category consists of four separate claim items. These claim items are: 1) increased costs for relocation of logging roads; 2) increased costs of replacing gravel supply; 3) increased animal damage to the remainder lands; and 4) increased management costs. The total amount claimed as category 5 severance damages was $1,751,312.

### 1) *Relocation of logging roads*

The first claim item listed above has been resolved by the parties. It is conceded plaintiff is entitled to recover $184,500 as severance damages because of logging road relocations which were the direct result of the partial taking. *See* note 2, *supra*.

### 2) *Gravel supply*

The land taken from plaintiff included a gravel supply. The gravel supply was located in the Redwood Creek area. Plaintiff used gravel to provide surface materials for the logging roads it constructed and maintained on its timberlands. Rickard concedes that plaintiff has been paid for the gravel deposit areas and attendant supply taken from it, but maintains that this payment did not include the higher costs of

developing alternative sources to replace the taken gravel deposit sites that would be needed in future road building and maintenance efforts on the remainder lands. There is no contention by plaintiff that alternative gravel was not available. Plaintiff seeks to recover as severance damages $443,500 because its gravel supply sites were taken.[42]

"The owner must be compensated for what is taken from him, but that is done when he is paid its fair market value for all available uses and purposes." *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 81, 33 S.Ct. 667, 679, 57 L.Ed. 1063 (1913). It has been said that a condemnee "is entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public." *Bauman v. Ross*, 167 U.S. 548, 574, 17 S.Ct. 966, 976, 42 L.Ed. 270 (1897). Plaintiff has been paid the fair market value of the gravel deposit sites and the gravel located thereon taken from it. It is not entitled to more.

 It is settled that not all losses suffered by the owner are compensable under the fifth amendment. The government must pay only for what it takes, not for opportunities which the owner may have lost. *United States ex rel. T. V. A. v. Powelson, supra*, 319 U.S. at 281, 283–84, 63 S.Ct. at 1056–57. Since alternative gravel was available to plaintiff, the fact that plaintiff may have had to pay more for said gravel after the taking would suggest a business loss or the loss of future profits on its timber operations. Such losses are not compensable. *See United States ex rel. T. V. A. v. Powelson, supra. United States v. 7936.6 Acres of Land*, 69 F.Supp. 328, 332 (D.P.R.1947). Finally, it would not be unreasonable, in my opinion, to view this claim essentially as one for the recovery of conse-

---

**42.** Plaintiff estimated that some 295,680 cubic yards of gravel would be required for road work subsequent to October 2, 1968, on its remainder lands. Plaintiff estimated it would cost an extra $1.50 per cubic yard to obtain gravel from alternative sites. Thus, its severance damage claim, because of higher gravel costs, works out to $443,500 (295,680 cubic yards $\times$ $1.50).

quential damages. Under federal law,[43] there can be no recovery for consequential damages as a result of a taking. *Mitchell v. United States*, 267 U.S. 341, 345–46, 45 S.Ct. 293, 294, 69 L.Ed. 644 (1925); *United States v. 91.90 Acres of Land, supra*, 586 F.2d at 87.[44] There exists no basis, in fact or in law, for awarding plaintiff additional just compensation in the form of severance damage for the taking of such gravel deposit areas.

### 3) *Animal damage*

The parties agree that young-growth redwood and Douglas fir trees are susceptible to damage by animals such as bear, deer, elk, squirrels, wood rats, etc. Generally, animals eat the tender inside the bark parts of said trees and either destroy the trees or inhibit their growth. Rickard's animal damage severance claim rests solely on bear damage because this animal was the only one documented in writings and studies, as of 1968, as the perpetrator of damage to young-growth trees in the Humboldt County area.

Rickard's rationale for severance damage due to anticipated actions of bears in young-growth tree stand areas was as follows. The establishment of the park on October 2, 1968, created a new and safe haven for bears where control measures (*e. g.*, traps, bear hunts, etc.) were prohibited. Rickard gave no consideration to placement of traps, etc., on the remainder property because such actions somehow would alienate the public which might thereafter engender adverse Secretarial action against plaintiff's lands. Accordingly, Rickard believed that a landowner would be prohibited from taking steps to control bears damaging his own property near the park because of fear of future adverse Secretarial action. Rickard anticipated that the bears would operate from the safety of the park to venture on plaintiff's second-growth remainder land areas to feed on young trees and thereafter return to the sanctuary and safety of the park. Such bear activities, according to Rickard, would serve to reduce future timber volume on the remainder lands and thus would reduce the value of the remainder lands as of October 2, 1968. Rickard further believed the creation of the park would serve to increase the bear population in and around the park area. These anticipations, which Rickard ascribed to a buyer and seller of the remainder land after the partial taking, provide the basis for

**43.** The measure of just compensation is governed by the United States Constitution. The Constitution has never been construed as requiring the payment of consequential damages. *See United States v. Miller*, 317 U.S. 369, 376, 379–80, 63 S.Ct. 276, 282–83, 87 L.Ed. 336 (1943). While the Congress could provide for the payment of consequential damages, it has not done so. *Mitchell v. United States*, 267 U.S. 341, 345–46, 45 S.Ct. 293, 294, 69 L.Ed. 644 (1925). Some state constitutions permit the award of consequential damages in eminent domain situations, as noted in the *Mitchell* case, *supra*, and thus the state cases relied on by plaintiff for consequential type awards are of no precedential value. Moreover, other cases relied on by plaintiff arguably do not involve consequential damages, *see Potts v. United States*, 130 Ct.Cl. 88, 92–94 (1954); *Mid-States Fats and Oils Corp. v. United States*, 159 Ct.Cl. 301, 311 (1962); *United States v. Benning*, 330 F.2d 527, 533–35 (9th Cir. 1964).

**44.** For example, spoilation of inventory and equipment, reduction in loss of goodwill and profits, expenses incurred in having to readjust manufacturing operations, frustration of contract or business, loss of business, and incurrence of relocation expenses incident to a taking are deemed non-recoverable consequential damages. *See Klein v. United States*, 179 Ct.Cl. 910, 915, 375 F.2d 825, 829 (1967), *cert. denied*, 389 U.S. 1037, 88 S.Ct. 770, 19 L.Ed.2d 824 (1968). *See also United States v. General Motors Corp.*, 323 U.S. 373, 379, 65 S.Ct. 357, 360, 89 L.Ed. 311 (1945). Interestingly, this court in the *Klein* case dealt with the question of the taking of gravel deposits and the noncompensability of related contracts to utilize said gravel. The concept of consequential damages, however, is sometimes troublesome and confusing in severance damage situations. *See R. J. Widen Co. v. United States*, 174 Ct.Cl. 1020, 1029–30, 357 F.2d 988, 993–94 (1966). *See also* 4A Nichols', The Law of Eminent Domain, § 14.1[1], [3] (1976). While the line between a compensable and noncompensable consequential loss in a severance damage situation may be thin at times, I believe the instant claim to fall on the side of noncompensable consequential loss.

Rickard's animal severance damage claim of $304,562.[45]

It is my opinion that a reasonable buyer and seller of the remainder lands on October 2, 1968, would not give any consideration to anticipated bear damage in negotiating a sale of said lands. Moreover, neither the facts, nor the law support the animal severance damage claim advanced by plaintiff.

It is a fact that bears and other animals do cause damage to young-growth trees. It is also true that bears caused damage to young-growth trees during the period 1945–1960 in Humboldt County. There is no evidence in the record of bear damage in the county subsequent to 1960. An inference could be drawn that the bear problem in California had been brought under control by 1960. The significant point is that bear damage was occurring for over 20 years in Humboldt County and other parts of California before Redwood National Park was established.[46] Moreover, the bear problem was the subject of a number of studies in the 1945–1960 period in California and there is not one indication in these studies that the various and numerous parks that existed in California were part of the problem because they provided safety for the marauding bears. Indeed, the park, when established on October 2, 1968, incorporated within its boundaries existing

state parks consisting of some 27,468 acres. There is no evidence that the commercial timberland areas in the vicinity of these parks, prior to 1968, were subject to attack from bears which operated from bases in these parks. There is no probative evidence in the record that would lead a reasonable and knowledgeable buyer to conclude as of October 2, 1968, that bears would specifically foray from the newly created park and cause damage to second-growth areas on the remainder lands in the future.

Rickard's experience in the redwood region began in 1973, as indicated previously. He had little, if any, personal knowledge of bear damage in the redwood timberlands as of October 2, 1968, or of the mentality of those who would buy and sell redwood timberlands at that time. Wallen and Halsey, on the other hand, were experienced in the redwood region, as well as with redwood timberland sales, before and after October 2, 1968. Neither Wallen nor Halsey viewed the existence of bears as creating any severance damages. Their views, on this record, are more reflective of those a reasonable buyer and seller would entertain as of October 2, 1968, than are the views of Rickard.

Plaintiff's claim rests on the premise that creation of the park would attract bears who, in turn, would use the park as a haven from which to attack their young-growth

---

**45.** As of October 2, 1968, it was estimated there were 44,306 acres of young-growth trees on the remainder lands. Rickard estimated that at least 10 board feet per acre per year would be lost due to bear damage. This works out to 443,000 board feet of lumber lost each year. Rickard estimated a value of $55 per MBF for these young-growth trees. This produced an annual loss of $24,365. Rickard believed the bear damage would commence on October 2, 1968, and continue thereafter. Accordingly, he capitalized the annual loss of $24,365 at 8 percent, in perpetuity, to arrive at his severance damage figure. As noted previously, *see* note 3 and the related discussion on page 4, plaintiff sold the remainder lands here in question in 1973. The damage computation advanced by plaintiff would, in any event, be excessive under these circumstances.

**46.** Park officials, covering the period 1968–1974, were unaware of any bear problem in the park. Moreover, the habitat of the park, according to these officials, was not such as would invite or sustain a bear population. It is known that bears are wide ranging and could easily operate on plaintiff's remainder lands from distances far removed from the park's boundary lines. There is no evidence that the bear population increased as a result of the creation of the park. Indeed, there is no evidence of bear damage on plaintiff's remainder cutover lands subsequent to October 2, 1968. *See* note 5, *supra*. Plaintiff did not call as witnesses any of its own officials or any landowner in Humboldt County, to establish the essential element of reasonable probability as distinguished from mere possibility of future bear damage on its remainder lands. *See United States v. Certain Parcel of Land in Jackson Co. Mo.*, 322 F.Supp. 841, 845 (W.D.Mo.1971).

trees.[47] It is questionable, in any event, if such intrusions provide a basis for recovery of severance damages. *See United States v. Pope & Talbot, Inc., supra,* 293 F.2d at 826; *Bishop v. United States,* 130 Ct.Cl. 198, 201, 203–04, 126 F.Supp. 449, 451–52 (1954), *cert. denied,* 349 U.S. 955, 75 S.Ct. 884, 99 L.Ed. 1279 (1955). If the wide ranging bears operated from parklands taken from others, or from other state parks in the nearby vicinity, plaintiff would clearly have no right to recover. *Campbell v. United States,* 266 U.S. 368, 371–72, 45 S.Ct. 115, 116, 69 L.Ed. 328 (1924). Further, even on the hypothesis that bear damage to plaintiff's young-growth trees would occur as a result of the taking, it was an unintended incident of the taking and thus insufficient to support a severance damage recovery. *See B. Amusement Co. v. United States,* 148 Ct.Cl. 337, 341, 180 F.Supp. 386, 389 (1960).

### 4) *Increased management costs*

Rickard believed that as a result of the partial taking, a buyer and seller of plaintiff's remainder lands would anticipate additional administrative costs which would serve to reduce the value of said remainder lands. These administrative costs would be necessary to avoid possible conflicts with the park and to minimize undesirable impacts with a conservation sensitive public and a Congress concerned with protecting the park from outside damages. Rickard felt an owner of the remainder land would have to pacify park officials so as not to cause any agitation which might induce the Secretary to take adverse action against the landowner under certain provisions of the Park Act, *e. g.,* additional taking of remainder lands, as discussed previously.

Central to Rickard's rationale for this claim was his belief that the park's objective, *i. e.,* preservation and protection of the park's resources, was quite different from the commercial landowner's objective, *i. e.,* profit. Contrary to plaintiff's assertion, the logging of trees on the remainder land, if done in a prudent manner, is not *per se,* inherently conflicting with the preservation of trees on the adjoining parkland. The coexistence of state redwood parks and commercial timberlands in California for decades prior to 1968 attest to this fact. Environmental considerations foster the goals of both parties.[48] Kleiner testified that generally dealings between adjoining timberland owners was not a common forest industry cost item. Further, he conceded that generally commercial timberland owners next to state parks in California had minimal problems with each other. However, he felt that the broad powers conferred on the Secretary by section 3(e) of the Park Act created a different situation and that increased administrative costs to deal with the park as a neighbor would be anticipated on and after October 2, 1968. In essence, this severance damage claim was based on anticipated conflicts with the parks.

In computing severance damages for this claim item, Rickard believed one top-level

47. There is no reasonable probability supportive of such a belief in this record. *See Olson v. United States, supra.* This conclusion serves to place the following cases relied on by plaintiff in proper perspective: *Idaho & Western Ry. Co. v. Coey,* 73 Wash. 291, 131 P. 810 (1913), where it was held the tendency of gophers and squirrels to propagate along land to be used as a right-of-way by a railroad could, if appreciable and imminent, be considered in determining remainder land reduction in value; *Lockart Power Co. v. Askew,* 110 S.C. 449, 96 S.E. 685 (1918), where it was held the erection of a dam on taken land created ponding on said land, which could reasonably be expected to breed mosquitoes with the reasonable probability of imminent health hazards, and thus was a factor a jury could consider as having a depreciation effect on remainder land; and *Southern Indi-*

*ana Power Co. v. Miller,* 185 Ind. 35, 111 N.E. 925 (1916), where a similar mosquito situation relative to ponded water was found to rest on sufficient reasonable probability so as to entitle the jury to consider the matter in determining whether there was damage to remainder land.

48. The record suggests that the motivations of each were quite similar. Each would be motivated to protect the natural resources on the lands under their control, *i. e.,* to keep streams clear; to make cutover lands productive as soon as possible; to manage the lands in an efficient and responsible manner; to prevent erosion, etc. These motivations would insure continued profitability and would also insure prudent conservation of natural, public resources.

manager, full time, would be necessary to deal solely with park officials, and others, on park-related matters affecting the land-owners. Public relations would be part of his responsibilities and he would be expected to travel to Washington, D. C. He would not have to be a forester. This additional administrative cost, according to Rickard, would be $35,500 per year, covering salary and employment costs ($27,500), vehicle use and costs ($3,000) and travel allowance ($5,000). Rickard further anticipated additional legal fees ($20,000 per year) and consulting fees ($10,000 per year) in order to deal effectively with park administrators and with legislative and governmental interests who the prospective buyer would anticipate might have influence on future harvest and management practices, policies and procedures on remainder land property.[49]

Rickard's anticipated total annual increased management costs were $65,500. Since these costs would be incurred in perpetuity, Rickard capitalized the $65,500 figure at 8 percent to arrive at an increased management cost severance damage claim, as of October 2, 1968, of $818,750. Since plaintiff sold its property in 1973, these claimed costs are most probably excessive in any event. See note 45, supra.

There is no persuasive evidence in the record which would lead me to conclude that a reasonable buyer and seller of plaintiff's remainder land property on October 2, 1968, would devalue said property by $818,-750 on the anticipation of incurring additional management costs, for reasons suggested by plaintiff, so as to avoid potential conflicts with the park. The record suggests that park officials did not want to do anything that would interfere with timber operations on neighboring commercial timberlands, a fact conveyed to the plaintiff in this case shortly after creation of the park. Further, the record suggests that as of October 2, 1968, park officials were manifesting a cooperative attitude as to their new neighbors, also a fact made known to plaintiff shortly after the park was created. The milieu existing on, and for a reasonable period after, October 2, 1968, was one of cooperation and working together, not of anticipated conflicts and antagonisms. While the possibility of conflicts with the park may have been visualized by a buyer and seller, the reasonable probability of a buyer and seller devaluating the remainder land in any sale thereof on or about October 2, 1968, under the existing cooperative climate, has not been shown on this record. See Olson v. United States, supra. Plaintiff's claim, as presented, rests more on speculation than it does on reasonable future probability.[50]

In any event, it seems to me that this severance damage claim is, in essence, one

49. There is no evidence in the record that on or after October 2, 1968, plaintiff employed a full-time top-level manager and/or attorneys and consultants to act as lobbyists, solely as a result of the partial taking, to handle company park-related matters. The absence of such evidence suggests that denial of this claim will reflect a "judgment from experience as against a judgment from speculation." See note 5, supra. Such evidence as is in the record suggests that company matters, including park-related matters, after the partial taking, were handled in the same manner and by the same company officials as was all company business prior to the taking.

50. Plaintiff relies on United States v. Benning, 330 F.2d 527 (9th Cir. 1964), in support of its anticipated increased management cost severance damage claim. In Benning, some 3.28 acres were taken from a large tract. The taken land virtually cut this tract into two parcels, leaving only a narrow corridor connecting the two parcels. It was found that the highest and best use of this tract prior to the taking, based on reasonable future probability, was development and use as residential subdivisions or country estate homesites. After the taking, because the unified tract was split virtually into two parcels, the Ninth Circuit observed that the cost of future road connections between these two parcels was greatly increased in the comprehensive planning of the future development of the remainder lands. There is no indication in Benning that future increased management expenses were involved, as suggested by plaintiff. The Ninth Circuit in Benning did not find the severance damages to the remainder land awarded by the district court on the above facts to be speculative since reasonable future probabilities underscored the award. To state the facts in Benning is to distinguish it from plaintiff's claim herein.

for consequential damages and thus not compensable. *See* notes 43 and 44, and text, *supra.* The claim, as advanced by plaintiff, seems to rest more on anticipated business operation frustrations or anticipated readjustment of business operations on the remainder lands because of the partial taking. Such business frustrations and readjustments have been held noncompensable. *See United States v. 91.90 Acres of Land, supra,* 586 F.2d at 87–88.

## IV *Delay in Payment*

Public Law No. 90–545, § 3(b)(2), 16 U.S.C. § 79c(b)(2) (1976), provides for a 6 percent interest to be paid when awarding compensation for the taking. The trial judge held that fixing the compensation for delay in payment was a judicial function, yet he found 6 percent interest per annum was reasonable and would constitute just compensation.

 We disagree with the interest rate established by the trial judge and reject the analysis used to reach that conclusion. It is important to note it was error for the trial judge to rely on the economic circumstances prevailing at the time of the taking. We should look instead to the economic circumstances prevailing in the years between the date of the taking and the date of payment. As we stated in *Miller v. United States,* 223 Ct.Cl. ——, 620 F.2d 812 (1980), which also dealt with a taking under the Redwood National Park Act, " 'the rate of interest allowed as part of just compensation is to be derived from the economic circumstances of the times intervening the taking and payment dates * * *.' " *Quoting Tektronix, Inc. v. United States,* 213 Ct.Cl. 257, 276, 552 F.2d 343, 353, *rehearing granted,* 213 Ct.Cl. 307, 557 F.2d 265 (1977) (concurring opinion) (hereafter *Tektronix*

*I* ). It also was error for the trial judge to place some of the risk in delay in payment on the plaintiff. The risk in delay in payment is that of defendant; even reasonable delays in payment require compensation. To rule otherwise would be an impermissible interference with plaintiff's right to seek a judicial determination of the amount of just compensation. *See Miller v. United States,* 223 Ct.Cl. at ——, 620 F.2d at 839. Finally, in order to avoid discrimination among litigants, we are required to place great weight on the strong judicial policy requiring uniformity of treatment of condemnees. *Id. See also Arkansas Valley Ry. v. United States,* 107 Ct.Cl. 240, 259, 68 F.Supp. 727, 730 (1946), *cert. dismissed,* 330 U.S. 811, 67 S.Ct. 1083, 91 L.Ed. 1266 (1947); *Carlstrom v. United States,* 147 Ct.Cl. 297, 306, 177 F.Supp. 245, 250 (1959).

Before the court, plaintiff argues for an interest rate finding similar to that awarded in *Miller.*[51] In *Miller* we acknowledged that under the holding in *Tektronix I*[52] the rate established in *Pitcairn* should be applied for the years after 1975 until it has been affirmatively demonstrated, under the *Pitcairn* analysis, that a different rate should be utilized. In *Miller,* without objection by defendant, the court took judicial notice of Moody's Composite Index of Yields on Long Term Corporate Bonds. In our examination of that data we determined the yields on long-term bonds rated Aaa[53] and found an interest rate of 8½ percent reasonably approximated such yields and there constituted an appropriate rate. As such, for the years 1975–1979, in the *Miller* case, plaintiffs were held entitled to an interest rate of 8½ percent per annum.

**51.** The *Miller* opinion was issued on April 16, 1980—long after plaintiff's trial and after the filing of plaintiff's moving brief.

**52.** Although not cited in the *Miller* opinion, *Tektronix, Inc. v. United States,* 216 Ct.Cl. 144, 575 F.2d 832, *cert. denied,* 439 U.S. 1048, 99 S.Ct. 1048, 58 L.Ed.2d 707 (1978) (hereafter *Tektronix II* ), reiterates the analysis required under *Pitcairn v. United States,* 212 Ct.Cl. 168, 547 F.2d 1106 (1976), *cert. denied,* 434 U.S.

1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978), and *Tektronix I.*

**53.** The rates established in *Pitcairn* and *Miller* were slightly less than the yields reported in Moody's; this occurs because "no one index of interest rates can be considered as controlling the rate of just compensation due for a delay in payment." *Miller v. United States,* 223 Ct.Cl. at ——, 620 F.2d at 840.

At oral argument defendant stated it had no objection to an award of payments for delay in compensation similar to that awarded in *Miller.* We likewise take judicial notice of Moody's Index. *See Tektronix, Inc. v. United States,* 216 Ct.Cl. at 150–151, 575 F.2d at 836. We feel an award similar to that provided in *Miller* for the period 1975–1979 is appropriate and also constitutes just compensation to this plaintiff for the delay in payment. *Miller,* however, provides no statistical guidance for the period from January 1, 1980, to the date of payment.[54] We believe the period January 1, 1980, until the date of payment presents special problems. Due to the current state of the economy there have been wide variations in the Index for this period, with a justifiable expectation for substantial increases in the relevant bond yields occurring before payment of this judgment. As such, we feel reaching a fair and just amount necessitates a remand to the trial judge on this issue. The trial judge will be able to analyze the actual situation and, with a much better idea of the date of payment, will then be able to approximate the yields reported by Moody's and award an appropriate amount to plaintiff.

In addition to plaintiff's argument noted above, in which we adopted without objection from defendant an interest rate for the period 1976–1979 similar to that in *Miller,* plaintiff apparently continues to rely on its arguments put forward in its moving brief. There plaintiff propounded two arguments. First, plaintiff asserts it should be entitled to a return which could have been earned by productive investment by plaintiff if the award had been paid on October 2, 1968. Alternatively, plaintiff argues that this court should adopt a level of interest which reflects the actual costs plaintiff incurred to borrow monies which, allegedly, it would not have had to if the severance damages had been awarded on the date of the taking.

Plaintiff has not persuaded us, however, to provide delay in payment compensation by a theory other than that established in *Tektronix I* and *II* or *Pitcairn.* Plaintiff's theories fail to provide an objective working rule (*see United States v. 564.54 Acres of Land,* 441 U.S. 506, 510–511, 99 S.Ct. 1854, 1856–57, 60 L.Ed.2d 435 (1979)), fail to consider all relevant data on which our decision must be made (*cf. Pitcairn v. United States,* 212 Ct. Cl. at 195, 547 F.2d at 1123), and fail to ensure uniformity of treatment, a policy upon which we are required to place great weight (*see Miller v. United States,* 223 Ct.Cl. at ——, 620 F.2d at 838).

 Specifically, we reject plaintiff's argument that it should be recompensed for its actual costs incurred in borrowing monies. In *Pitcairn* the court similarly rejected the use of plaintiff's cost of interest. The court held:

> * * * The court does not approve of this actual cost method. Plaintiffs are not usually in the business of borrowing money and thus costs based on their own borrowing rates are highly speculative. * * * Neither the cost to the Government nor to the plaintiff of borrowing money is an appropriate measure of just compensation, * * *. [212 Ct.Cl. at 196, 547 F.2d at 1123–1124.]

Therefore, here, as in *Miller,*

> * * * [n]o variance from the interest rates set in *Pitcairn* and *Tektronix [I]* for the years up through 1975 can be made for plaintiff[ ]. This court is bound both by our prior decisions and the above-mentioned policy favoring uniform treatment of condemnees with respect to the amount of just compensation for delay of payment. * * * [223 Ct.Cl. at ——, 620 F.2d at 840.]

Hence, the delay period is divided into several periods utilizing a rate of simple interest of 6½ percent per annum for the period 1968–1970 and a rate of 7½ percent per annum for the period 1971–1975. We feel the rate used in *Miller* for the period 1976–1979 is appropriate and will also apply it here; therefore, a rate of 8½ percent per annum simple interest for that period is awarded plaintiff. For the period January

---

**54.** *Miller* awarded those plaintiffs a rate of 12 percent simple interest for 1980.

1, 1980, until the date of payment, the trial judge shall determine the appropriate reasonable rate, as discussed above.

### V Litigation Expenses

 Plaintiff contends it is entitled to recover litigation expenses because of the proceedings in this court under the provisions of the Uniform Relocation Act, *supra.* Past decisions of this court, in redwood taking cases, have clearly held that plaintiff is not entitled to recover litigation expenses for the legislative taking of its property. *Rocca v. United States,* 205 Ct.Cl. 275, 281–84, 500 F.2d 492, 495–97 (1974); *see Kelly v. United States,* 209 Ct.Cl. 706, 709 (1976); *Simonson Lumber Co. v. United States,* 208 Ct.Cl. 1026, 1027 (1976).[55] Plaintiff's argument for an interpretation of the Uniform Relocation Act that would support recovery by them of litigation expenses is most un-persuasive in light of the *Rocca* decision, *supra.*[56]

### CONCLUSION OF LAW

Based on the opinion and findings of fact which are made a part of the judgment herein (the necessary findings of fact having been included in the report), the court concludes that the plaintiff is entitled to recover from the United States $1,464,091, together with simple interest at a rate of 6½ percent per annum from October 2, 1968, to December 31, 1970; 7½ percent per annum from January 1, 1971, to December 31, 1975; and 8½ percent per annum from January 1, 1976, to December 31, 1979. The rate of interest for the period from January 1, 1980, to the date of payment of the judgment shall be determined by the trial judge in accordance with this opinion.

The court further concludes that plaintiff is not entitled to recover reasonable litiga-

---

55. Plaintiff's reliance on the majority opinion in *United States v. 1,308.09 Acres of Land,* 574 F.2d 238 (5th Cir. 1978), which allowed recovery of appraisal expenses in a condemnation case is clearly misplaced. That decision was summarily reversed by the United States Supreme Court on February 26, 1979, *sub nom. United States v. Bodcaw Co.,* 440 U.S. 202, 99 S.Ct. 1066, 59 L.Ed.2d 257 (1979), a fact noted by plaintiff in its reply brief. *See also Leesona Corp. v. United States,* 220 Ct.Cl. ——, ——, 599 F.2d 958, 970, *cert. denied,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). Further, plaintiff's statement that litigation expenses were awarded as part of a settlement in *Hosford v. United States,* Ct.Cl. No. 149–70 on April 19, 1971, which involved a taking under the Park Act, is unsupported by the judgment order issued by the court or a fair reading of the file in that case. In any event, a settled case has no precedential value. *See Pitcairn v. United States, supra,* 212 Ct.Cl. at 195, 547 F.2d at 1123; *Sternberger v. United States,* 185 Ct.Cl. 528, 537–38, 401 F.2d 1012, 1017–18 (1968). Finally, plaintiff's argument that, since portions of the case at bar were settled, the settlement provisions of the Uniform Relocation Act entitle it to litigation expenses is without merit. *Arcata Nat'l Corp. v. United States,* 206 Ct.Cl. 819 (1975), was a settled redwood taking case in which litigation expenses were not awarded. It seems well settled now that recovery of litigation expenses under the Uniform Relocation Act is appropriate only in inverse condemnation cases and is not appropriate in condemnation cases or in cases where property is legislatively taken.

56. Plaintiff's reliance on a subsequent bill (S. 261, 93d Cong., 1st Sess. (1973)) which was never enacted into law, under which the Uniform Relocation Act would be amended so as to clearly cover legislative takings is misplaced. This bill did not become "subsequent legislation" so the case of *Sioux Valley Empire Elec. Ass'n v. Butz,* 504 F.2d 168, 173 (8th Cir. 1974), cited and relied on by plaintiff is inapposite. Mere bills, introduced in Congress but never passed, like opinions of individual members of Congress, directed at past legislation, have little, if any, significance in determining congressional intent. *See Hart v. United States,* 218 Ct.Cl. ——, 585 F.2d 1025, 1032 (1978). *See also National School of Aeronautics, Inc. v. United States,* 135 Ct.Cl. 343, 350–51, 142 F.Supp. 933, 938 (1956); *United States v. United Mine Workers of Am.,* 330 U.S. 258, 281–82, 67 S.Ct. 677, 690, 91 L.Ed. 884 (1947). Courts are most leary of use of subsequent legislative materials that purport to interpret earlier legislation. *Hart v. United States, supra,* 218 Ct.Cl. at ——, 585 F.2d at 1035. Further, *Will-Tex Plastics Mfg., Inc. v. HUD,* 346 F.Supp. 654 (E.D.Pa.1972), cited by plaintiff, does not support plaintiff's argument for that case did not involve the question of entitlement to litigation expenses under the Uniform Relocation Act but instead involved an unsuccessful attempt, relying on specified provisions of the Act, to obtain injunctive relief to halt certain redevelopment programs.

tion expenses actually incurred by plaintiff because of the proceedings in this case.

Pursuant to Rule 131(c) this case is remanded to the trial division for a determination of the final amount.